**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Marvin JENKINS, Defendant-Appellant.**

**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Ross PROCK, Defendant-Appellant.**

**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Rich WHITE, Defendant-Appellant.**

**Nos. 84–1267, 84–1268 and 84–1281.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 14, 1985.

Decided March 27, 1986.

Barbara A. Corprew, U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Thomas F. Pitaro, John P. Fadgen, Patrick C. Clary, Lorraine Mansfield, Las Vegas, Nev., for defendants-appellants.

Before GOODWIN, NELSON and CANBY, Circuit Judges.

CANBY, Circuit Judge:

This case arises from a scheme to obtain by fraudulent means financing insured by the Federal Housing Administration (FHA) under the Title 1 Mobile Home Loan Program. The government alleged that, by altering and inflating manufacturer invoices and by bribing employees of Sherwood & Roberts (S & R), an FHA-insured lender, appellants Marvin Jenkins, Ross Prock and Rick White sought to obtain government-insured financing for mobile homes they were selling through Young American Mobile Home Sales of Las Vegas, Nevada. Appellants were stockholders, officers and employees of Young American.

The bribes, in the form of kickbacks of several hundred dollars for each loan processed, were intended to facilitate easy loan approval by S & R. By altering manufacturer invoices, Young American could secure for its customers insured financing for "extras" not normally permitted under Title 1 guidelines.

Appellants were tried on an indictment that charged thirteen counts of making false statements to obtain loans insured by the FHA, 18 U.S.C. § 1010 (1982), and one count of conspiring to defraud the government by such statements, 18 U.S.C. § 371 (1982). A jury found all three guilty of conspiracy and Prock guilty on four false-statements counts. They appeal on various grounds. We affirm.

## I. PROOF OF FEDERAL INSURANCE

Appellants contend that their convictions should be reversed because the government failed to prove the existence of a contract of insurance between S & R and the FHA, as alleged in the indictment. The existence of federal insurance, they argue, is an essential element of a Section 1010 offense (or conspiracy to violate Section 1010), without which the trial court lacks subject matter jurisdiction. The issue is one of first impression in this and all other circuits.

### A. *Construction of Section 1010*

Section 1010 [1] prohibits making false statements in loan transactions involving

---

1. 18 U.S.C. § 1010 provides:
 Whoever, for the purpose of obtaining any loan or advance of credit from any person, partnership, association, or corporation with the intent that such loan or advance of credit shall be offered to or accepted by the Department of Housing and Urban Development for insurance, or for the purpose of obtaining any

extension or renewal of any loan, advance of credit, or mortgage insured by such Department, or the acceptance, release, or substitution of any security on such a loan, advance of credit, or for the purpose of influencing in any way the action of such Department, makes, passes, utters, or publishes any statement, knowing the same to be false, or alters,

the Department of Housing and Urban Development (HUD). The statute is invoked here because FHA is a HUD agency.

Appellants contend that the language of Section 1010 mirrors that of 18 U.S.C. § 1014, which punishes false statements to "any bank the deposits of which are insured by the Federal Deposit Insurance Corporation...." Because proof of FDIC insurance is an essential element of a Section 1014 charge, *see United States v. Platenburg*, 657 F.2d 797, 799 (5th Cir.1981), appellants argue that, by parallel reasoning, proof of insurance should also be an element of a Section 1010 charge. The existence of federal insurance, they argue, is what makes the offense a federal one.

The government disagrees. It argues that, while direct proof of FHA insurance is relevant, it has never been held necessary to a Section 1010 violation. The cases cited by the government, however, are not conclusive. Most of the cited cases deal with the ephemeral issue of intent in these cases; while they do not hold proof of insurance to be an element of a Section 1010 violation, they do not reject it as one either. *See, e.g., United States v. Barbato*, 471 F.2d 918, 921–22 (1st Cir.1973); *United States v. Leach*, 427 F.2d 1107, 1111 (1st Cir.), *cert. denied*, 400 U.S. 829, 91 S.Ct. 57, 27 L.Ed.2d 59 (1970); *Brilliant v. United States*, 297 F.2d 385, 389 (8th Cir.), *cert. denied*, 369 U.S. 871, 82 S.Ct. 1140, 8 L.Ed.2d 275 (1962).

Section 1010 is composed of several operative clauses written in the disjunctive. False statements made in several different contexts can trigger its application. It is therefore important to our decision to determine which clause was invoked.

■ The indictment alleges that appellants violated the first prohibition mentioned in Section 1010, that of false statements "for the purpose of obtaining a loan or advance of credit ... with intent that the loan or advance of credit shall be offered to or accepted by [HUD] for insurance...." We conclude that proof of government insurance is not an element of this offense.[2]

The statute makes clear that the prohibited false statement can be made to "any person, partnership, association, or corporation;" an FHA-approved lender is not required. All that must be shown is that a defendant knowingly made a false statement on a document intended to be "offered to or accepted by" HUD for insurance. It is the defendant's intent to mislead the government, no matter how or through whom that deception is accomplished, that is in issue. There is no requirement that any intermediary be covered by existing insurance.

The plain language of Section 1010 is quite different from that of Section 1014. In Section 1014 cases, the focus is quite properly on the party to whom the false statement was made. A person violates that part of Section 1014 relied on by appellants only if a false statement is made to an FDIC-insured bank. But, as we have said, no such requirement exists under Section 1010. The false statement may be made to anyone; it is the intent behind the statement that is in issue.[3]

B. *Subject Matter Jurisdiction*

■ The argument that government insurance must be proved to support federal subject matter jurisdiction is also flawed. In light of Congress's plenary power to regulate interstate commerce, *see, e.g., Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 195, 6 L.Ed. 23 (1824), it is beyond dispute

---

forges, or counterfeits any instrument, paper, or document, or utters, publishes, or passes as true any instrument, paper, or document, knowing it to have been altered, forged, or counterfeited, or willfully overvalues any security, asset, or income, shall be fined not more than $5,000 or imprisoned not more than two years, or both.

2. Our holding here is narrow and concerns only those charges that involve Section 1010's first prohibition. We intimate no view as to whether proof of federal insurance would be required to sustain convictions for other types of Section 1010 violations.

3. We note that the jury was instructed in full accordance with the rulings we make today.

that Congress may declare it a crime to make false statements with intent to obtain a government-insured loan. The district court accordingly had jurisdiction under 18 U.S.C. § 3231.

### C. *The Indictment*

Our conclusion that proof of federal insurance is not an essential element of the offense charged does not end our inquiry, however. The indictment recites allegations that S & R held an insurance contract with the government and that the contract dictated the rights and obligations of S & R and the government in this matter.[4] Appellants argue that the government offered insufficient proof of these allegations, necessitating reversal of their convictions. We reject this contention.

■ As our cases have held, an indictment must provide a defendant with a description of the charges against him sufficient: (1) to enable him to prepare his defense; (2) to ensure him that he is being prosecuted on the basis of facts presented to the grand jury; (3) to enable him to plead double jeopardy against a later prosecution; and (4) to inform the court of the facts alleged so that it can determine the sufficiency of the charge. *United States v. Bohonus*, 628 F.2d 1167, 1173 (9th Cir.), *cert. denied*, 447 U.S. 928, 100 S.Ct. 3026, 65 L.Ed.2d 1122 (1980); *see also United States v. Christopher*, 700 F.2d 1253, 1257 (9th Cir.), *cert. denied*, 461 U.S. 960, 103 S.Ct. 2436, 77 L.Ed.2d 1321 (1983).

■ The cases make clear that the government need not prove all facts charged in an indictment; instead, only enough facts to prove the essential elements of the crime must be demonstrated at trial. *United States v. Hughes*, 766 F.2d 875, 879 (5th Cir.1985); *United States v. Archer*, 455 F.2d 193, 194 (10th Cir.), *cert.*

*denied*, 409 U.S. 856, 93 S.Ct. 135, 34 L.Ed.2d 100 (1972). Insofar as the language of an indictment goes beyond alleging elements of the crime, it is mere surplusage that need not be proved. *United States v. Greene*, 497 F.2d 1068, 1086 (7th Cir.1974), *cert. denied*, 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975); *Gawne v. United States*, 409 F.2d 1399, 1403 (9th Cir.1969), *cert. denied*, 397 U.S. 943, 90 S.Ct. 956, 25 L.Ed.2d 123 (1970).

■ The inclusion of surplusage must not be allowed to prejudice a defendant in the context of his case. *United States v. Aguilar*, 756 F.2d 1418, 1423 (9th Cir.1985). But appellants here make no claim that the indictment failed to inform them fully of the charges against them or that they were otherwise prejudiced by the allegations of government insurance. Nor could they, on these facts.

■ As we have held, proof of federal insurance is not an essential element of the crimes charged here. To the extent that the indictment included allegations that appellants' false statements were directed to an FHA-approved lender, the language was surplusage that did not have to be proved at trial. Its inclusion was harmless.

### II. USE OF WHITE'S CIVIL DEPOSITION

White and Jenkins argue that their convictions should be reversed because the trial court improperly admitted deposition testimony that White gave in a civil action arising out of the same facts. The testimony was damaging because in it White acknowledged that Young American's financing arrangment with S & R constituted "federal fraud."

### A. *White's Claim*

White argues that use of this deposition violated his fifth amendment privilege

---

4. The indictment charged appellants with conspiracy
 ... to knowingly and willfully make, pass, utter and publish false statements knowing the same to be false, for the purpose of obtaining a loan and an advance of credit from an insured financial institution and with the intent that such loan and advance of credit

would be offered to and accepted by [HUD] for insurance....
Elsewhere, the indictment alleged that S & R held a "contract of insurance under Title I of the National Housing Act and made insured financing available through approved mobile home dealers to purchasers of mobile homes in the State of Nevada."

against self-incrimination where, as here, he did not testify in his own behalf at his criminal trial.

 This claim is frivolous. The fifth amendment privilege is not ordinarily self-executing and must be affirmatively claimed by a person whenever self-incrimination is threatened. *Minnesota v. Murphy,* 465 U.S. 420, 429, 104 S.Ct. 1136, 1143, 79 L.Ed.2d 409 (1984). An individual may lose the benefit of the privilege inadvertently, without a knowing and intelligent waiver. *Garner v. United States,* 424 U.S. 648, 654 n. 9, 96 S.Ct. 1178, 1182 n. 9, 47 L.Ed.2d 370 (1976). White did so when he gave his deposition.

 White claims further that his deposition testimony was not voluntary. He argues that it was compelled because he was subpoenaed to appear. This argument is equally meritless. In *Murphy,* the Supreme Court made clear that an obligation to appear and testify truthfully does not constitute compulsion to give incriminating testimony. The privilege may still be asserted at the proceeding and must be to avoid waiver of the privilege. *See Murphy,* 465 U.S. at 427–28, 104 S.Ct. at 1142.

Because White's statements at the deposition were voluntary, they were clearly admissible against him as party admissions under Federal Rule of Evidence 801(d)(2)(A). *See, e.g., United States v. O'Connor,* 737 F.2d 814, 821 (9th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 1198, 84 L.Ed.2d 343 (1985).

### B. Jenkins' Claim

 Jenkins asserts that the deposition testimony was "powerfully incriminating" as to him within the meaning of *Bruton v. United States,* 391 U.S. 123, 135, 88 S.Ct. 1620, 1627, 20 L.Ed.2d 476 (1968). Because White did not testify at the trial, Jenkins contends that he was denied his sixth

amendment right of confrontation when the deposition testimony was admitted. Examination of White's testimony, however, shows that no portion of it "directly implicated" Jenkins, as required for a successful *Bruton* claim. Jenkins is never mentioned. It is only in the context of the other evidence of guilt presented by the government that the statements tend to implicate Jenkins in any way; even then, the reference to him is oblique. *See United States v. Brooklier,* 685 F.2d 1208, 1218 (9th Cir.1982) (per curiam), *cert. denied,* 459 U.S. 1206, 103 S.Ct. 1194, 75 L.Ed.2d 439 (1983); *see also United States v. Wright,* 742 F.2d 1215, 1223 (9th Cir.1984); *United States v. Burreson,* 643 F.2d 1344, 1349 (9th Cir.), *cert. denied,* 454 U.S. 830 (1981). Because White's testimony did not directly implicate Jenkins, the *Bruton* claim fails.

## III. SEVERANCE OF THE TRIALS

White argues that the trial court erred in denying his motion to sever his trial from that of the other defendants. He asserts that, but for the joinder, he could have called codefendant Jenkins, who would have testified favorably for him. Moreover, White states that he was a minor actor in the scheme and that his conviction resulted from a spillover effect from the evidence against the other defendants.[5] In this court, denial of severance is reviewable under an abuse of discretion standard. *United States v. Harris,* 738 F.2d 1068, 1073 (9th Cir.1984).

 When the reason for severance is the need for a codefendant's testimony, defendant must show that he would call the codefendant at a severed trial, that the codefendant would in fact testify, and that the testimony would be favorable to the moving party. *United States v. Seifert,* 648 F.2d 557, 563 (9th Cir.1980); *see also*

---

5. White also contends that severance was required under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), because of the government's expected use of Jenkins' grand jury testimony. *See infra* Part IV. Because the testimony might have implicated him and because Jenkins would have been unavailable for cross-examination, White argues that severance was required. At trial, however, the government did not introduce the grand jury testimony. We therefore need not address this claim.

*United States v. Mayo,* 646 F.2d 369, 374 (9th Cir.), *cert. denied,* 454 U.S. 1127, 102 S.Ct. 979, 71 L.Ed.2d 115 (1981).

White relies on *Seifert,* but it is distinguishable. In *Seifert,* counsel had proffered a detailed outline of the codefendant's expected testimony, and the trial court had found that the testimony would be favorable to the moving party. It was only in this context that we reversed the district court's denial of the severance motion.

■ By contrast, White merely makes a bare assertion that Jenkins' testimony would have been favorable. Moreover, his assertion comes despite a statement in his original severance motion that Jenkins' grand jury testimony actually implicated him. White even raised a *Bruton* claim for severance based on the same fear of inculpatory testimony. This case, then, appears to be more like *Mayo,* in which we upheld the denial of a severance motion where the codefendant's testimony would not necessarily have been favorable to the moving party. *Mayo,* 646 F.2d at 374.

■ White's spillover claim must also fail. As we held in *United States v. Sears,* 663 F.2d 896, 901 (9th Cir.1981), *cert. denied,* 455 U.S. 1027, 102 S.Ct. 1731, 72 L.Ed.2d 148 (1982), a party seeking reversal of a denial of severance carries "the difficult burden of demonstrating clear, manifest or undue prejudice resulting from a joint trial." It is not enough that a "separate trial might offer a defendant a better chance of acquittal, or that the prosecution's case is stronger against a codefendant." White makes no particularized showing of prejudice beyond an assertion, disputed by the government, that he was a minor player in the scheme. Moreover, the trial judge here was careful to give several cautionary and limiting instructions to ensure that the jury could compartmentalize

the evidence. Nothing indicates that these admonitions were insufficient. *See United States v. Brady,* 579 F.2d 1121, 1128 (9th Cir.1978), *cert. denied,* 439 U.S. 1074, 99 S.Ct. 849, 59 L.Ed.2d 41 (1979).

## IV. JENKINS' MOTION TO SUPPRESS HIS GRAND JURY TESTIMONY

Jenkins argues that the trial court erred in denying his motion to suppress his grand jury testimony without an evidentiary hearing.[6] Jenkins argues that, prior to his appearance before the grand jury, he was misled by a letter from the government attorney who prosecuted this case. In the letter, Jenkins was told that the grand jury had no substantial evidence linking him to the commission of a crime and that he was not a putative defendant. A false sense of security created by the letter, Jenkins argues, induced him to testify in a self-incriminating manner. Thus, use of his testimony would have violated his fifth amendment privilege against self-incrimination and the due process requirement of fundamental fairness. Jenkins apparently objects to both the denial of his suppression motion and the denial of an evidentiary hearing.

■ Motions to suppress statements on fifth amendment voluntariness grounds deserve a fair hearing and a reliable determination. *Jackson v. Denno,* 378 U.S. 368, 391, 84 S.Ct. 1774, 1788, 12 L.Ed.2d 908 (1964). But this requirement applies only if substantial facts are in dispute. *See id.* The magistrate who initially considered the motion to suppress found that there were no factual disputes, and this finding is wholly supported.

■ Jenkins' real complaint is that the suppression motion was denied. We find the denial proper. Jenkins was under subpoena to testify before the grand jury.

---

**6.** Although the district court denied the suppression motion, the government decided not to use the testimony at trial. Jenkins contends that the denial of the motion to suppress caused him to forego testifying on his own behalf. Because the merits of the motion to suppress are clear, we proceed to address them and assume without deciding that they are properly raised here. *See Luce v. United States,* 469 U.S. 38, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984) (defendant who does not testify not entitled to review denial of motion to suppress prior conviction, which, had he testified, might have been used for impeachment).

While the government attorney's letter to him did indicate that he was not then a putative defendant, the letter also clearly stated that he was "a subject of a federal grand jury investigation." Moreover, the letter said that he could become a "target" of the investigation at any time. Most important, the letter detailed Jenkins' rights to refuse to answer incriminating questions and to retain counsel. The letter stated, "Anything you do say may be used against you by the Grand Jury or in a subsequent legal proceeding."

As we have already pointed out, appearance before a grand jury or other proceeding pursuant to subpoena does not constitute compulsion within the meaning of the fifth amendment. Because Jenkins failed to assert his fifth amendment privilege during the grand jury proceedings, he is deemed to have waived his rights. *Minnesota v. Murphy*, 465 U.S. 420, 427–29, 104 S.Ct. 1136, 1142–43, 79 L.Ed.2d 409 (1984); *United States v. Swacker*, 628 F.2d 1250, 1252–53 (9th Cir.1980).

## V. AUTHENTICATION OF PROCK'S SIGNATURE

■ Prock contends that the district court erred in denying his post-trial motion for acquittal. The motion was based in part on the ground that jurors were permitted to make handwriting comparisons to authenticate Prock's signature on various FHA loan documents. Prock claims that, because the handwriting exemplars given to the jury were check requests containing only the words "O.k. Ross," the jury did not have a complete handwriting sample to compare with the FHA documents.

This claim is frivolous. Under *United States v. Woodson*, 526 F.2d 550, 551 (9th Cir.1975) (per curiam), a jury may make handwriting comparisons except under extreme or unusual circumstances. Indeed, *Woodson* makes clear that the jury is obliged to make such comparisons and draw conclusions from them.

Prock contends that use of an incomplete signature exemplar constitutes an "extreme or unusual circumstance." But he cites, and we can find, no case supporting this proposition. "Extreme or unusual circumstances" involve situations where the authenticity of the handwriting is the primary issue in the case, as where forgery is alleged. Our independent examination of the examplars convinces us that a reasonable jury could well conclude that the same person signed the check requests and the loan applications.

Moreover, Prock offered no evidence to rebut the authenticity of the signatures here. As the Third Circuit has held, effective rebuttal lessens the danger that jurors will assign improper weight to their comparisons of handwriting samples. *United States v. Clifford*, 704 F.2d 86, 91 (3rd Cir.1983).

## VI. EVIDENCE OF JENKINS' PRIOR BAD ACTS

■ Jenkins argues that his conviction should be reversed because the trial court improperly permitted government witness Judith Rouse to testify to some irregularities in a conventional loan Jenkins arranged on a mobile home she purchased from Young American. The acts in question occurred more than a year before the alleged conspiracy, and Jenkins argued at trial that the evidence was irrelevant and prejudicial. The trial court admitted the evidence under Federal Rule of Evidence 404(b) and agreed to give a limiting instruction. Jenkins now argues that admissibility under Rule 404(b) was improper, that no jury instruction was given, and that the evidence was also inadmissible under Federal Rule of Evidence 403.

The evidence was properly admitted under Rule 404(b). The fact that Jenkins used fraudulent means to secure conventional loans is probative on issues of intent, knowledge, good faith and absence of mistake in dealing with the FHA transactions. *See, e.g., United States v. Walls*, 577 F.2d 690, 696 (9th Cir.), *cert. denied*, 439 U.S. 893, 99 S.Ct. 251, 58 L.Ed.2d 239 (1978); *United States v. McDonald*, 576 F.2d 1350, 1356 (9th Cir.), *cert. denied*, 439 U.S. 830, 99 S.Ct. 105, 58 L.Ed.2d 124 (1978).

Having concluded that the evidence is admissible under Rule 404(b), we review the Rule 403 determination for an abuse of discretion. *United States v. O'Connor*, 737 F.2d 814, 819 (9th Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 1198, 84 L.Ed.2d 343 (1985). The district court admitted the evidence only after both sides presented their arguments on probative value and undue prejudice. The district court's determination that the probative value was not outweighed by the prejudice is supportable on this record. There was no abuse of discretion.

■■■ After the court held the evidence admissible, counsel for Jenkins and White both requested a curative instruction, and the judge agreed to give one. Following the testimony, however, the admonition covered only the testimony's application to other defendants. There was no further limiting instruction, as appears required by *United States v. Bailleaux*, 685 F.2d 1105, 1109–10 (9th Cir.1982). The problem with Jenkins' argument at this stage is that he did not object to the curative instruction given following the testimony or to the absence of an instruction as part of the jury charge. It is not at all clear from the record that such a further objection would have been unavailing. Jenkins therefore waived the request for a curative instruction.

### VII. SUBSTANTIAL EVIDENCE

■■■ In one fashion or another, each appellant claims that the verdict in his respective case was not supported by substantial evidence. Our review of the record convinces us that the evidence was sufficient to support the jury's verdict. The evidence was conflicting on some points, but resolution of those conflicts is the province of the jury, not this court. We will not disturb the jury's factfinding on the record before us.

### VIII. CONCLUSION

Having reviewed defendants' various contentions and finding them meritless, we affirm the convictions in all three appeals. AFFIRMED.