968 F.2d 1222
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Josuf PAPRANIKU, aka Sofi, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Shaban DOBROVA, Defendant-Appellant.
 Nos. 91-30162, 91-30230.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted June 1, 1992.
Decided July 1, 1992.
 
 Before WRIGHT, CANBY and WIGGINS, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 Appellants Dobrova and Papraniku appeal their convictions, following a jury trial, for violating 21 U.S.C. § 841(a), possession with intent to distribute and 21 U.S.C. § 846, conspiracy. Dobrova claims that the district court erred in failing to use his version of the public authority instruction. He also argues that the district court placed him in double jeopardy by permitting the jury to announce its verdict on a lesser included offense and then continue to deliberate on the greater offense. Papraniku argues that the district court erred in failing to sever his trial, suppress certain evidence and find that he was entrapped as a matter of law. He also claims that the district court committed Bruton error by allowing the introduction of incriminating statements made by Dobrova. Lastly, he claims that his convictions should be reversed as the government committed Brady error and outrageous misconduct during its prosecution of his case. We have jurisdiction pursuant to 28 U.S.C. § 1291. We affirm the district court.
 
 BACKGROUND
 
 3
 The events leading to the videotaped purchase of three kilograms of cocaine by the defendants in this case began in November of 1989. November of 1989 was the first time that defendant Shaban Dobrova met the government informant Ramon Sanchez. The meeting occurred in Dobrova's restaurant, Omega Pizza. At that meeting, Dobrova asked Sanchez whether he knew anyone who was selling cocaine. Later that month, Dobrova introduced Sanchez to Josuf Papraniku. Prior to the introduction, Sanchez witnessed Papraniku selling drugs to another person. Papraniku later approached Sanchez and asked if he knew anyone who sold kilograms of cocaine. Sanchez said no, but told him that he would keep let Papraniku know if he found someone. Sanchez reported these conversations to one of his controllers, DEA agent Robert Cayford.
 
 
 4
 Sanchez periodically kept in touch with the defendants from November through June of 1990. These contacts were reported to the DEA agents. Late in June, Dobrova told Sanchez that Papraniku wanted to discuss the purchase of two kilograms of cocaine with him. Sanchez told Dobrova that he had a source of cocaine in the lower 48 states. Sanchez reported the conversation and was ordered by the agents to tell the defendants that the supplier would be in town during the first week in July.
 
 
 5
 Sanchez met with the defendants on July 9th and told them that the supplier wanted to meet at a motel on July 11th. The defendants objected to the meeting place and nothing was decided at that time. The DEA agents told Sanchez to tell the defendants that the supplier would only meet in a motel. Sanchez met with the defendants on July 10th and they agreed to the meeting which was to take place at 1:00 p.m. the next day.
 
 
 6
 Sanchez met with the defendants on July 11th and told them that the meeting would take place at the Barratt Inn at 3:00 p.m. At the motel, the defendants met with Edward Torres, an undercover agent. Torres was wearing a concealed microphone. The microphone had been attached in haste and as a result some of what the others said at the meeting was inaudible. At the meeting, Papraniku identified himself as the person interested in purchasing the drugs. Torres and Papraniku then negotiated for the sale of two kilograms of cocaine for $23,000 each. Papraniku wanted to complete the sale on the same day, but agent Torres put the sale off until July 13th.
 
 
 7
 The purchase was arranged for 1:00 p.m. on July 13th. On July 12th Papraniku approached Sanchez about the possibility of purchasing three rather than two kilograms of cocaine.
 
 
 8
 On July 13th, the defendants met at the Omega. Dobrova was accompanied by his nephew Vojniku. Sanchez and the three defendants then drove to the motel. At the motel, Torres produced three one-kilogram packages of cocaine. Dobrova and Papraniku each opened a package of the cocaine and tested it by tasting a small amount. Papraniku opened the third package and tested it too. He then negotiated with Torres to take all three kilograms. Papraniku offered partial payment immediately with the balance to be paid later. Dobrova offered to guarantee payment citing his ownership of the Omega. The exchange was made and the defendants left. The defendants were apprehended in the hallway outside the room. The defendants attempted to flee, but all were captured.
 
 
 9
 Defendant Dobrova claimed to be acting as a government agent. This defense arose out of the fact that Dobrova had previously been acting as an FBI listening post. Dobrova had approached the FBI in October of 1989 and offered to become an information source for the government. Dobrova was told of the Attorney General's guidelines for informants and agreed to comply with them. The guidelines specifically prohibited any participation in illegal activity without the express consent of the FBI. Between November and June of 1990 Dobrova made twenty contacts with the FBI. However, Dobrova never reported any of the contacts with respect to the drug deal at issue. The FBI first learned of the deal from the DEA the day before it took place. The FBI immediately terminated Dobrova's informant status, but was unable to inform him of this until after his arrest.
 
 
 10
 Both Dobrova and Papraniku were indicted and convicted of violating 21 U.S.C. § 841(a), possession of a controlled substance with intent to distribute and 21 U.S.C. § 846, conspiracy. They now appeal.
 
 DISCUSSION
 
 11
 I. The District Court Properly Denied The Motions To Sever
 
 
 12
 The district court has broad discretion to grant or deny a motion to sever. United States v. Ramirez, 710 F.2d 535, 545 (9th Cir.1983). A denial of a motion to sever is reviewed only for abuse of discretion. Opper v. United States, 348 U.S. 84, 95 (1954); United States v. Valles-Valencia, 811 F.2d 1232 (9th Cir.1987); United States v. Conners, 825 F.2d 1384, 1391 (9th Cir.1987); United States v. Douglass, 780 F.2d 1472, 1478 (9th Cir.1986). The district court may grant severance where it appears that the defendant would be significantly prejudiced by a joint trial with his codefendants. See United States v. Escalante, 637 F.2d 1197, 1201 (9th Cir.), cert. denied, 449 U.S. 856 (1980). On review of a denial of a motion to sever, the moving party must show that "a joint trial was so manifestly prejudicial as to require the trial judge to exercise his discretion in but one way, by ordering a separate trial." United States v. Abushi, 682 F.2d 1289, 1296 (9th Cir.1982). The moving party must show that one of his substantive rights was violated so as to demonstrate that he was denied a fair trial. United States v. Conners, 825 F.2d 1384, 1391 (9th Cir.1987). Such substantive rights have been identified as "unavailability of full cross-examination, lack of the opportunity to present an individual defense, denial of Sixth Amendment confrontation rights, lack of separate counsel among defendants with conflicting interests, or failure to instruct the jury properly on the admissibility of evidence as to each defendant." United States v. Escalante, 637 F.2d 1197, 1201 (9th Cir.), cert. denied, 449 U.S. 856 (1980).
 
 
 13
 Papraniku has not demonstrated that any of his substantive rights were violated by the district court's refusal to sever the trial. Papraniku claims that the jury could not separately evaluate the evidence against him. This claim is meritless. First, Papraniku was charged with the same offenses as Dobrova and the evidence admitted was admissible against both defendants. Second, the jury was instructed to consider the evidence against each defendant separately. Finally, this was not a case where the overwhelming quantity of evidence pertains to only one defendant with the attendant danger that that evidence might influence the jury with respect to the other jointly tried defendant.
 
 
 14
 Papraniku also contends that severance was proper due to the conflicting testimony of Dobrova. This argument is also meritless. Severance is mandated only where the defenses of the codefendants are mutually exclusive. United States v. Ramirez, 710 F.2d 535, 546 (9th Cir.1983). Papraniku's defense was not mutually exclusive of Dobrova's defense. Acceptance of either defense did not preclude the jury from accepting the other defense.
 
 
 15
 Papraniku further claims that the joinder prevented him from eliciting favorable testimony from defendant Vojniku. Papraniku's objection is that Vojniku chose not to testify on his own behalf, thereby preventing Papraniku from calling him as witness. Papraniku apparently believes that had there been separate trials he could have called Vojniku as a witness and elicited the alleged favorable testimony. This assumption is erroneous. Any testimony by Vojniku in a separate trial of Papraniku would have been admissible in Vojniku's trial and the prosecutor would have the opportunity to cross-examine Vojniku. In all likelihood Vojniku would have refused to testify in a separate trial of Papraniku by simply asserting his Fifth Amendment right. Papraniku's inability to elicit testimony from Vojniku was not caused by the joinder of the trials but, rather, by Vojniku's desire to avoid incriminating himself. See United States v. Jenkins, 785 F.2d 1387, 1393 (9th Cir.), cert. denied, 479 U.S. 855, 889 (1986). Furthermore, there is no showing that any testimony by Vojniku would have assisted Papraniku.
 
 
 16
 Finally, Papraniku claims that the joinder precluded the court from giving an instruction cautioning the jury with respect to Dobrova's testimony because he testified as a government agent. This argument is completely baseless. Dobrova did not testify as a government agent. Dobrova claimed to be a government agent but the jury rejected that defense. Furthermore, the cautioning instruction sought by Papraniku is given in situations where the witness is getting a benefit from the government in exchange for his testimony. See People of Territory of Guam v. Dela Rosa, 644 F.2d 1257, 1259 (9th Cir.1980). Here, Dobrova did not receive any benefit from the government in exchange for his testimony. He testified as a defendant and not as a government witness. Therefore, we affirm the district court.
 
 
 17
 II. The District Court Did Not Err In Permitting Testimony On The Meetings Which Were Taped By The Government
 
 
 18
 Papraniku claims that the government acted in bad faith by purposely causing portions of the audio tapes of the July 11th meeting to be inaudible and portions of the videotape of the July 13th exchange to be obscured. Papraniku thus claims that the district court erred in not dismissing the indictments. The district court addressed this issue and after conducting an evidentiary hearing, concluded that there was no evidence of bad faith on the part of the government. Therefore, the district court refused to dismiss the case. An examination of the record reveals no evidence to support Papraniku's claim. Furthermore, there is no evidence to suggest that the portions of the tapes which were imperfect would have helped Papraniku's case. In fact, the record suggests that those portions would have further incriminated Papraniku.
 
 
 19
 Papraniku also argues that the district court erred in allowing eyewitness testimony of the agents as to the substance of the conversations which were recorded on the ground that portions of the tape were inaudible. This claim is also meritless. The tapes were not admitted into evidence. Instead the agents testified from memory about what was said. This hearsay testimony is permissible under Fed.R.Evid. 801(d)(2). The fact that the tapes were inaudible has nothing to do with whether the agents could testify. The agents did not translate the tapes; they testified from memory.
 
 
 20
 Papraniku also claims that the videotape should not have been admitted into evidence because of its imperfections. The imperfections noted are that the agent accidentally blocked the camera's view while Papraniku was testing the cocaine. If anything, this imperfection helped Papraniku. Furthermore, "a recorded conversation is generally admissible unless the unintelligible portions are so substantial that the recording as a whole is untrustworthy." United States v. Lane, 514 F.2d 22, 27 (9th Cir.1975). The admission of a recorded conversation is left to the sound discretion of the trial judge. Cape v. United States, 283 F.2d 430, 435 (9th Cir.1960). Here, the district court did not abuse its discretion in allowing the videotape into evidence. As the government aptly points out, a videotape's failure to show more of the incriminating conduct is no more a valid reason for excluding it than the failure of an eyewitness to see all of an event would be a reason for excluding the witness' testimony respecting what he accurately observed. See Id. Therefore, we affirm the district court.
 
 
 21
 III. There Was No Bruton Error Committed By The Introduction Of Dobrova's Testimony Which Inculpated Papraniku
 
 
 22
 Papraniku claims a Bruton violation based on the introduction of statements and testimony of Dobrova which inculpated Papraniku. This claims is baseless. Limitations on the admissibility of statements of a codefendant are based on the confrontation clause of the Sixth Amendment. See Bruton v. Maryland, 391 U.S. 123 (1968). In order to raise a Bruton claim, the codefendant obviously must not be available for cross-examination. Here, Dobrova testified at trial. He was cross-examined by Papraniku. Thus, there was no Bruton violation. We affirm the district court.
 
 
 23
 IV. The Delay In Disclosing Certain Cumulative Impeachment Evidence Was Not a Brady Violation
 
 
 24
 Papraniku claims that the government committed a Brady violation by delaying the disclosure of impeachment evidence. The district court specifically addressed this issue and determined that the evidence in question was cumulative. Furthermore, the court took steps to ensure that the delay was not in any way prejudicial. The district court even allowed the defense the opportunity to recall witnesses and to introduce further evidence.
 
 
 25
 The government does have an obligation to disclose material favorable to the defense including impeachment information. Giglio v. United States, 405 U.S. 150 (1972); United States v. Gerard, 491 F.2d 1300, 1302 (9th Cir.1974). Where the Brady material has been simply delayed and not suppressed, however, the relevant inquiry is whether the delay was so prejudicial that the defendant was denied a fair trial. United States v. Miller, 529 F.2d 1125, 1128 (9th Cir.), cert. denied, 426 U.S. 924 (1976). A district court finding of no prejudice is reviewed under the clearly erroneous standard. United States v. Dupuy, 760 F.2d 1492, 1497 (9th Cir.1985).
 
 
 26
 There is no evidence in the record to suggest that Papraniku was so prejudiced as to have been denied a fair trial. The district court took great pains to ensure that the delay did not prejudice the defense. We affirm the district court.
 
 
 27
 V. Papraniku Was Not Entrapped As A Matter Of Law
 
 
 28
 The issue of whether there was entrapment as a matter of law is by definition a question of law which is reviewed de novo. United States v. McConney, 728 F.2d 1195, 1201 (9th Cir.) (en banc), cert. denied, 469 U.S. 824 (1984). In order for entrapment to exist as a matter of law, "there must be undisputed testimony making it patently clear that an otherwise innocent person was induced to commit the act complained of by trickery, persuasion, or fraud of a government agent." United States v. Hsieh Hui Mei Chen, 754 F.2d 817, 821 (9th Cir.1985). The "controlling question on review is whether the defendant lacks the predisposition to commit the act." Id.
 
 
 29
 This circuit has identified five factors to be considered in determining whether a defendant was predisposed to commit a crime. United States v. Bonnano, 852 F.2d 434, 438 (9th Cir.1988), cert. denied, 488 U.S. 1016 (1989). These factors are (1) the defendant's character or reputation; (2) whether the government made the initial suggestion of criminal activity; (3) whether the defendant engaged in the activity for profit; (4) the nature of the government's inducement; and most importantly, (5) whether the defendant showed reluctance to commit the criminal act. Id.; see also United States v. Reynoso-Ulloa, 548 F.2d 1329, 1341 (9th Cir.1977), cert. denied, 436 U.S. 926 (1978).
 
 
 30
 An examination of these five factors clearly indicates that there was no entrapment as a matter of law. Papraniku has not shown that there is undisputed evidence establishing that he was not predisposed to commit the crime. First, the record reveals that Papraniku was associated with drug dealing prior to the crime at issue. Second, it is disputed as to who made the initial suggestion for the drug purchase. Papraniku claims that Sanchez pressured him to do the deal. Sanchez claims that Papraniku approached him looking for a supplier. Third, Papraniku engaged in the deal for profit. He was to make $10,000 from the sale. Fourth, the only inducement offered by the government was the monetary profit from the deal. That profit was not so outrageous as to overwhelm the will of an innocent person. Fifth, it is disputed whether Papraniku showed any reluctance to commit the crime. Papraniku claims that he was pressured into the deal by Sanchez and Dobrova. Sanchez claims that Papraniku approached him and showed no reluctance to do the deal. Furthermore, there was testimony indicating that Papraniku wanted even more drugs than were originally offered. He asked for three kilograms rather than the two originally agreed upon at the July 11th meeting. That seems inconsistent with his claimed reluctance. Thus, it is clear that Papraniku has not established by undisputed evidence that he was entrapped as a matter of law. We affirm the district court.
 
 
 31
 VI. The Government Did Not Commit Outrageous Misconduct
 
 
 32
 The issue of whether police misconduct violates notions of constitutional due process is a question of law which is reviewed de novo. United States v. Wylie, 625 F.2d 1371, 1378 (9th Cir.1980), cert. denied, 449 U.S. 1080 (1981). While the existence of outrageous misconduct is a question of law, the evidence is viewed "in the light most favorable to the government." United States v. Emmert, 829 F.2d 805, 810-11 (9th Cir.1987). As a defense, police misconduct is a close relative of entrapment and has been applied where the involvement of the police in the criminal activity "reach[es] such proportions as to bar [the] conviction of a predisposed defendant as a matter of due process." Hampton v. United States, 425 U.S. 484, 493 (1976) (Powell, J., concurring).
 
 
 33
 The due process defense, while potentially broad, is in fact extremely limited. See United States v. Bagnariol, 665 F.2d 877, 881-83 (9th Cir.1981), cert. denied, 456 U.S. 962 (1982) (tracing the development of the doctrine in this circuit as well as in the Supreme Court). Prosecution is barred only when the law enforcement misconduct "shocks the conscience [of the court]." United States v. Bogart, 783 F.2d 1428, 1438 (9th Cir.), vacated on reh'g, 790 F.2d 802 (1986). The Supreme Court has never reversed a criminal conviction on this ground. See United States v. Russell, 411 U.S. 423 (1973); United States v. Ramirez, 710 F.2d at 539. Only twice have circuit courts reversed a criminal conviction on this ground. Ramirez, 710 F.2d at 540. In each of those cases, the police engineered new crimes for the sole purpose of prosecuting the defendants. Id.
 
 
 34
 Papraniku's claim that the government committed outrageous misconduct is baseless. Under the standard of review, taking the evidence in a light most favorable to the government, it is clear that there was no misconduct. The record reveals that Papraniku initiated the discussions about drug dealing, that he willingly participated in the deal and that he was not subject to any undue influence from any of the other participants. The record further reveals that Dobrova was not acting as a government agent nor was Sanchez paid on a contingent fee basis for results. The record does not support Papraniku's claim that the government manufactured the crime. The government simply provided the opportunity for Papraniku and Dobrova to engage in criminal activity. Police involvement in the crime was minimal. The police had an undercover agent pose as a seller to obtain the evidence necessary to arrest the dealer. Such conduct is standard procedure for law enforcement agencies and does not raise due process concerns. See Ramirez, 710 F.2d at 541; (the government may use artifice and deception to uncover evidence of criminal activity); see also id. (undercover police officers may supply contraband to a suspect to gain his confidence); United States v. Wylie, 625 F.2d at 1378 (government agents may use informants and pay them). Thus, the use of the confidential informant Sanchez and the undercover agent in this case did not violate Papraniku's due process rights.
 
 
 35
 VII. The District Court Did Not Err In Failing To Use Dobrova's Own Version Of The Public Authority Instruction
 
 
 36
 Fed.R.Crim.P. 30 provides that "[no] party may assign as error any portion of the charge or omission therefrom unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds for that objection." Where the defendant failed to state "distinctly" the objection raised on appeal, the claim is reviewed for plain error only. United States v. Payne, 944 F.2d 1458, 1463 (9th Cir.1991). "A plain error is a highly prejudicial error affecting substantial rights." United States v. Bustillo, 789 F.2d 1364, 1367 (9th Cir.1986). "The availability of a better instruction is not a ground for reversal." United States v. Ward, 914 F.2d 1340, 1344 (9th Cir.1990).
 
 
 37
 Dobrova did object to the public authority instruction used by the district court but did so on grounds other than those he has raised here. At trial, Dobrova objected to the instruction in conjunction with the simple possession instruction on the ground that even if the jury accepted his defense it could still convict on the simple possession count. The district court noted the objection and altered its simple possession instruction to address the objection. Dobrova, unsatisfied with the change, renewed his previous objection. At no time did Dobrova object to the instruction on the grounds asserted on appeal. The making of an objection to an instruction on one ground does not put the court on notice of other possible objections pertaining to the same instruction. See United States v. Hernandez-Escarsega, 886 F.2d 1560, 1573 (9th Cir.1989), cert. denied, 110 S.Ct. 3237 (1990).
 
 
 38
 A defendant is entitled to have the court instruct the jury on his theory of defense so long as the theory is supported by law and has some foundation in the record. United States v. Mason, 902 F.2d 1434, 1438 (9th Cir.1990). However, the defendant is not entitled to have his proposed instructions used by the court. United States v. Kaplan, 554 F.2d 958, 968 (9th Cir.), cert. denied, 434 U.S. 956 (1977). "The instructions given need not be in the precise language requested by the defendant. The refusal to give a requested instruction is not error if the charge as a whole adequately covers the theory of the defense." Id.
 
 
 39
 Here, the district court did instruct the jury on Dobrova's theory of the case. It gave a public authority instruction which told the jury that it should acquit Dobrova if it believed that he acted with the intent to help the law enforcement agencies prevent the distribution of cocaine. Likewise, the conspiracy instruction incorporated this defense as it required that the jury find that Dobrova had an intent to further the object of the conspiracy. Under the standard of review, the district court committed no clear error in its instructions to the jury with respect to Dobrova's public authority defense.
 
 
 40
 Papraniku also complains that the district court's failure to use Dobrova's requested instruction violated his rights. This issue was not raised below and thus is reviewed for plain error. Papraniku claims that he was denied an instruction that Dobrova was testifying as a government witness because of the court's failure to use the requested public authority instruction. This claim is meritless. First, Dobrova did not testify as a government witness. He was not called by the government and he was not given anything by the government in exchange for testifying. Second, whether the court used Dobrova's proposed instructions has nothing to do with whether Papraniku was entitled to his government witness instruction. We affirm the district court on each of these issues.
 
 
 41
 VIII. Dobrova Was Not Placed In Double Jeopardy By The Jury's Piecemeal Announcement Of Its Verdicts
 
 
 42
 Dobrova claims that he was placed in double jeopardy because the jury returned a verdict on the lesser included offense of simple possession prior to completing its deliberations on the greater offense of possession with intent to distribute. While this is a clever argument, there is no law to support it and the claim is meritless. The crux of Dobrova's argument is that when the jury found him guilty of simple possession, it could not find him guilty of possession with intent to distribute. He argues that the verdict on the simple possession charge was an implicit acquittal of the possession with intent charge. This is not true. Dobrova seems to rely on the situation where a jury is discharged after delivering a verdict on the lesser included offense. In that situation, because the jury was discharged, there is an implicit acquittal on the greater offense. Here, the jury was not discharged and the jury specifically indicated that it intended to deliberate further on the greater charge. It is procedurally proper for the district court to accept a unanimous verdict on one charge and return the jury to deliberate further on other charges. United States v. Ross, 626 F.2d 77, 81 (9th Cir.1980). That is what occurred here. While Dobrova is correct that the verdict on the simple possession charge was final, it was not a final verdict with respect to the possession with intent charge. In fact, as a separately charged offense, the possession verdict had absolutely nothing to do with the charge of possession with intent. Double Jeopardy was not implicated.
 
 
 43
 Double Jeopardy protects a defendant from being twice tried for the same offense. U.S. Const., Amend. V. Dobrova was not tried twice. The government was not given another opportunity to prove his guilt. See Burks v. United States, 437 U.S. 1, 11 (1978). Dobrova's initial jeopardy for the possession with intent charge did not end with the verdict on the simple possession charge, as the jury indicated it was still deliberating on that charge and it was proper for the court to return the jury to its deliberations.
 
 
 44
 Therefore, the judgment of the district court is hereby AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3