371 F.3d 606
 UNITED STATES of America, Plaintiff-Appellee,
v.
Wayne ANDERSON, Defendant-Appellant.
 No. 02-10600.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted January 14, 2004.
 Filed June 10, 2004.
 
 Michael L. Ware, Fort Worth, TX; Hill Snellings, Sacramento, CA; Michael L. Minns, Houston, TX, for defendant-appellant.
 Benjamin B. Wagner, Assistant United States Attorney, Sacramento, CA, for plaintiff-appellee.
 Appeal from the United States District Court for the Eastern District of California; Lawrence K. Karlton, Senior District Judge, Presiding. D.C. No. CR-01-00180-1-LKK.
 Before: WALLACE, NOONAN, and McKEOWN, Circuit Judges.
 NOONAN, Circuit Judge:
 
 
 1
 Wayne Anderson appeals the judgment of the district court convicting him of conspiracy and money laundering. Holding that the government failed to specify one of the offenses identified by 18 U.S.C. § 1956 as an offense permissibly represented in a sting operation, we reverse Anderson's conviction of money laundering. We affirm his conviction of conspiracy.
 
 FACTS
 
 2
 Suspicious that an organization named Anderson Ark & Associates (AAA) was engaged in facilitating income tax evasion and bankruptcy fraud, agents of the Internal Revenue Service (IRS) began an investigation followed by a series of stings that led to the arrest and conviction of several participants in this international organization. We summarize here evidence relevant to two stings implicating Anderson:
 
 
 3
 1. The Conspiracy To Commit Bankruptcy Fraud. In October of 2000, IRS Agent James Dowling posing as "Jim Mitchell" informed Richard Marks that he had $60,000 in cashier's checks that he wanted to hide from a bankruptcy court. Marks, an employee of AAA, put Dowling in touch with Karolyn Grosnickle, AAA's chief administrative officer. On behalf of AAA she accepted the checks and told Dowling that the funds would be sent by Anderson to an account set up by Mitchell with AAA in Costa Rica. Grosnickle identified Anderson as the head of AAA's domestic operations and the brother of its founder. Records on Anderson's computer and records obtained from Pinal County Federal Credit Union (PCFCU) show $60,000 from Anderson was deposited there in the name of Freddie Wood (the former companion of the founder), then transferred to Mitchell's AAA account in Costa Rica, $30,000 of which was then transferred to a secret account in the name of Mitchell in the United States. Grosnickle and Marks each identified Anderson as a key person in the money laundering scheme.
 
 
 4
 On January 31, 2001, in Los Osos, California, Agent Dowling in his role as Mitchell again met with Marks. Mitchell told Marks he had $100,000 in a safe deposit box in San Francisco that he needed to move. The next day Marks arranged for Mitchell to meet Anderson at a restaurant. Mitchell was accompanied by Diane Taggart, an IRS agent posing as Mitchell's girlfriend. Mitchell thanked Anderson for his help in hiding funds from the bankruptcy court, and Anderson acknowledged his thanks as follows:
 
 
 5
 Mitchell: So, and without that, I would have been out in the street. You know?
 
 
 6
 Anderson: Belly up; huh?
 
 
 7
 Mitchell: Been belly up.
 
 
 8
 (Laughter.)
 
 
 9
 Mitchell: Cause, I'll tell you, when that Bankruptcy Court comes through there, —
 
 
 10
 . . .
 
 
 11
 Anderson: Eat it all up, and then they tell you here, you here, you can have what's all left.
 
 
 12
 Mitchell: Right.
 
 
 13
 Anderson: Yep, no problem, I've helped a couple of other people out with that.
 
 
 14
 . . .
 
 
 15
 2. The Bank Fraud. At the meeting in Los Osos, Mitchell launched into a new story as revealed in this transcript of a recording of the conversation:
 
 
 16
 Mitchell: ... What we do is we lease anything and everything for other companies or individuals. So, if it doesn't, basically, eat or excrete, we'll lease it for you. So, we've, I've got a good relationship with a, with a couple of banks, ah you know, in Boston, in New York, and Detroit, and they handle all the financing for me. So let's say, if you wanted to buy another, another motor home, okay, and you were a business, ah and you didn't want to buy it, but you wanted to lease it. You'd come to me, and I would arrange the leasing, and I'd go to the banks and get the financing. So, that's what we're doing now, and it's just, it's going great guns, and our profit, basically, comes in from, ah we charge a little bit more, just like any other finance company, for handling that for you and doing the paperwork and stuff. So, what we do is I, have a, a friend that, that developed over the years who is a ah banker, and he told me, he said, "Jim, look, you know, there is a better way of doing this. The banks are charging so much interest to you that, you know, they got a policy here that they only expect even, sometimes just 95 percent. If they get 95 percent payback, they're happier than a pig in slop." I said, "Well, what do you mean?" This guy the banker's name is Dick, and I said ah, "Well, what do you mean?" He said, "Well, look, he says, you're getting paid. Your leasees are paying you, and you, you pay over to the bank on the leases; right?" I said, "Yeah." "He said, So, if you only paid 95 percent of, of their loan in, the bank's happy; so, willing to do business with you, again." He says, "And you keep the five percent." Well, I said, "Okay." "Well let's see how this worked." So, we started doing that, and ah then we send the ban — a letter into the bank, and said, you know, This is the on — we got 95 percent sent back," and they said, "You're fine." I pay my, my friend Dick a one percent commission, he's happy. I take the four percent. I cash the last check at the bank that the person wrote it on, come out with the cash. Everyone's happy, and the bank is beating down my door to do more business....
 
 
 17
 . . . .
 
 
 18
 Mitchell: Yeah. Well, my problem is, is like, the product I wind up with is a lot of cash.
 
 
 19
 Anderson: Um-hum.
 
 
 20
 Mitchell: Right? So, it's like, if you were the last, last, making the last payment or interim payment, I take it and cash it at your bank; right?
 
 
 21
 Anderson: Don't they realize —
 
 
 22
 Mitchell: And I walk out with it —
 
 
 23
 Anderson: — you're pulling out four percent to yourself?
 
 
 24
 Mitchell: No, I'm actually pulling five. I'm giving one percent to the banker.
 
 
 25
 Anderson: Okay, but I mean they don't see you taking in the check to cash (unintelligible)
 
 
 26
 Mitchell: Um-um [negative], because I, I don't put it in my account.
 
 
 27
 Anderson: Yeah?
 
 
 28
 Mitchell: I cash it at the bank, the bank it's drawn on.
 
 
 29
 Anderson: Yeah.
 
 
 30
 Mitchell: So, that's why I've got this cash.
 
 
 31
 Anderson: Yeah, but the bank you're doing that at has got to know what you're doing.
 
 
 32
 Mitchell: They never ask questions.
 
 
 33
 Anderson: They never ask questions.
 
 
 34
 . . .
 
 
 35
 Mitchell: ... At the end of the lease period, I write a letter to the bank in New York and Michigan, and I say, "You know, we got 95 percent paid, but, you know, things are bad with this company right now, and they can't pay." They send me a letter back saying, "Well, if you can't pay, that's close enough. That's good." Because they're making a ton of money.
 
 
 36
 Anderson told Mitchell he could help him and have the cash credited to Mitchell's AAA account in Costa Rica. Outside the restaurant Mitchell gave Anderson the cash in ten bundles of $10,000 in a bag. On February 15, 2003, Mitchell found $100,000 credited as Anderson had promised. Later in the month the amount was sent back to his secret account in the United States.
 
 PROCEEDINGS
 
 37
 On May 3, 2001, Anderson was indicted together with Marks, Grosnickle, and Anderson's brother. On April 29, 2002, Grosnickle pleaded guilty to one count of conspiracy to commit money laundering. On May 31, 2002, the jury found Marks and Anderson guilty on one count of conspiracy to launder money and found Anderson guilty on one count of money laundering. Anderson was sentenced on each count to 4 years and 11 months, to be served concurrently.
 
 
 38
 Anderson appeals.
 
 ANALYSIS
 
 39
 The Alleged Brady Violation. In the course of showing the movement of the $60,000 through an account in the name of Freddie Wood at PCFCU, the government called Freddie Wood, who testified that it was not she who had deposited the money. During the trial the government produced an employee of the bank who, when asked by the defense, testified that she believed that she was dealing with Freddie Wood when the deposit was made by telephone. Another bank employee, also belatedly identified by the government, confirmed this belief.
 
 
 40
 Anderson argues that the government's not identifying these two witnesses earlier was a violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), prejudicial to Anderson's cross-examination of Wood. The defense, however, did secure the testimony of these witnesses at trial and could have recalled Wood if it was believed that they would impeach her. The delay in identifying the two witnesses did not prejudice the defendant. United States v. Span, 970 F.2d 573, 583 (9th Cir.1992).
 
 
 41
 The Conspiracy To Launder Money. Grosnickle and Marks each identified Anderson as the one who would help hide Mitchell's $60,000. Their identification shows a conspiracy and place Anderson within it. When Mitchell met Anderson for the first time on February 1, 2001 at the restaurant, Mitchell referred to what AAA had done. Anderson showed sufficient awareness that he had cooperated in Mitchell's fraud. Bankruptcy fraud in violation of 18 U.S.C. § 152 is one of the specified unlawful activities that may be represented to a suspected money launderer by an undercover government agent; agreement to launder money to conceal it from the bankruptcy court violates 18 U.S.C. § 1956.
 
 
 42
 Bank Fraud. We agree with Anderson that the government produced insufficient evidence to convict him on the money laundering/bank fraud count. This issue involves an interplay between 18 U.S.C. § 1956(a)(3) ("sting" provision of the money laundering statute) and 18 U.S.C. § 1344(2) (bank fraud statute) — an interplay made knottier by the subterfuge inherent in sting operations. To convict Anderson under 18 U.S.C. § 1956(a)(3), the government had to prove that Anderson conducted or attempted to conduct "a financial transaction" involving property represented to be the proceeds of "specified unlawful activity." In this case, the "specified unlawful activity" was bank fraud in violation of 18 U.S.C. § 1344(2). Two issues are presented: 1) whether the government produced sufficient evidence for a reasonable jury to conclude that Anderson conducted or attempted to conduct "a financial transaction"; and 2) whether the government sufficiently represented to Anderson that the $100,000 it gave him indeed constituted the proceeds of bank fraud. The government met its evidentiary burden on the former point, but fell short of meeting its burden on the latter. We are not unsympathetic to the government's argument that providing its targets with too much detail would spoil the sting, but the statute requires that the scenario of the sting represent specific unlawful acts.
 
 
 43
 Financial Transaction. The government did produce sufficient evidence for a reasonable jury to conclude that Anderson conducted or attempted to conduct "a financial transaction." Section 1956(c)(4)(B) defines "financial transaction" to include "a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree." 18 U.S.C. § 1956(c)(4)(B). As it is used in 18 U.S.C. § 1956, then, the term "financial transaction" is a term of art constituting both an element of the offense and a jurisdictional prerequisite. See, e.g., United States v. Ripinsky, 109 F.3d 1436, 1443-44 (9th Cir.1997), as amended by 129 F.3d 518 (9th Cir.1997). Here, the government produced evidence that the hand-off of the $100,000 in California led to a wire transfer of credit from Costa Rica to the United States, sufficient evidence for a reasonable jury to conclude that Anderson conducted or attempted to conduct "a financial transaction." Accordingly, in addition to satisfying its evidentiary burden on this element, the government also established a sufficient interstate commerce nexus to satisfy the jurisdictional prerequisite.
 
 
 44
 Anderson argues that the government was cabined by Count 5 of the indictment to proving that the currency "had been transported in interstate commerce" (as opposed to proving that the transaction affected interstate commerce after the "hand-off") in order to establish the jurisdictional nexus embodied in the "financial transaction" element of 18 U.S.C. § 1956. Count 5 of the indictment charged that Anderson:
 
 
 45
 did knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, specifically, he received $100,000 in U.S. currency which had been transported in interstate commerce, which involved property represented by a person acting at the direction of, and with the approval of a law enforcement officer, to be the proceeds of specified unlawful activity, that is bank fraud in violation of Title 18 United States Code, Section 1344.... All in violation of Title 18 United States Code, Sections 1956(a)(3) and (2).
 
 
 46
 To the extent the indictment went beyond alleging elements of the crime, "it is mere surplusage that need not be proved." United States v. Jenkins, 785 F.2d 1387, 1392 (9th Cir.1986). The government needed only to prove a financial transaction affecting interstate commerce; whether the interstate commerce occurred before or after Anderson received the funds is irrelevant. The language in the indictment specifying the timing of the interstate transport of currency is "surplusage." Anderson makes no claim that the indictment failed to inform him fully of the charges against him or prejudiced his defense. Reversal is not warranted on the ground that the currency itself was not proved to have been transported in interstate commerce.
 
 
 47
 Representation That $100,000 Constituted The Proceeds Of Bank Fraud. The jury instruction given in this case aptly summarizes the elements of 18 U.S.C. § 1344(2) bank fraud:
 
 
 48
 First, there must exist a scheme or plan to obtain money or property from a financial institution by making a false statement or promise;
 
 
 49
 Second, the statement and/or promise was known by the maker of the statement or promise to be false;
 
 
 50
 Third, the statement or promise made to the financial institution was material, that is it would reasonably influence a bank to part with money or property;
 
 
 51
 Fourth, the maker of the statement or promise acted with intent to defraud; and
 
 
 52
 Fifth, the financial institution was federally chartered or insured.
 
 
 53
 In its effort to set up the sting, the government failed to sufficiently represent the first element — that the money was obtained from a financial institution, and the fifth element — that the financial institution was federally chartered or insured.
 
 
 54
 As to the first element, the undercover government agent did not represent to Anderson that the $100,000 he gave Anderson was obtained from a financial institution "by making a false statement or promise." To the contrary, the agent's "story" was that he had obtained the money from his clients, not the bank. The agent represented fraud perpetrated on the clients, not the bank.
 
 
 55
 Even assuming the government showed that the money was obtained from a bank, the undercover government agent did not represent to Anderson that the $100,000 he gave him was obtained from a federal-chartered or insured financial institution. In making the "representations" on which its case hinges, the government gave Anderson no details whatsoever about the banks purportedly used in the scheme. No representation is no representation.
 
 
 56
 The government argues that Anderson would have assumed that Mitchell's scheme involved a federal bank and that it is unrealistic to expect undercover agents to reveal whether a bank is federally insured during a staged illicit transaction. However, because the money laundering conviction in this case hinges entirely on the government's representations to Anderson, it is incumbent on the government to ensure that its representations sufficiently track the federal crime in order to put the participants on notice of the crime. Simply put, with time, resources, and opportunity to design the scenario, it is not too much to ask the government to get it right.
 
 
 57
 In his Reply Brief, Anderson sensibly does not repeat his argument that at trial he was misjoined with Marks, who had a higher level of culpability. It was not a winning argument.
 
 
 58
 For the reasons stated, Anderson's conviction and sentence on Count 1 are AFFIRMED; his conviction and sentence on Count 5 are REVERSED.
 
 WALLACE, Senior Circuit Judge, concurring:
 
 59
 I concur in the majority's opinion, except for its analysis of bank fraud as "specified unlawful activity" under 18 U.S.C. § 1956(a)(3). I agree that Anderson's conviction must be reversed because the undercover agent represented that the $100,000 he gave Anderson was fraudulently obtained from his clients rather than "a financial institution." 18 U.S.C. § 1344(2). Although we need go no further, the majority did. I therefore do not agree that we must also reverse on the ground that the agent failed to represent to Anderson that the financial institutions allegedly involved were federally insured.
 
 
 60
 "To require government agents to ... specific[ally]" name defrauded banks or inform suspected money launderers that the victimized banks are federally insured "[c]ould make it difficult for undercover agents to enforce [section 1956], as real criminals would be unlikely to state explicitly [which banks were] the source of their funds." United States v. Nelson, 66 F.3d 1036, 1041 (9th Cir.1995). The majority's holding "[c]ould be too costly in the verisimilitude vital to sting operations," United States v. Wydermyer, 51 F.3d 319, 327 (2d Cir.1995), cited with approval in Nelson, 66 F.3d at 1041, and may serve no useful purpose in cases where "any person of ordinary intelligence" would recognize that the money constituted proceeds of an unlawful bank fraud, United States v. McLamb, 985 F.2d 1284, 1291 (4th Cir.1993), cited with approval in Nelson, 66 F.3d at 1041; see also United States v. Leslie, 103 F.3d 1093, 1103-04 (2d Cir.1997) (affirming a money laundering conviction when a defendant "believed that the money was the proceeds" of a drug transaction based on an undercover FBI agent's statement that the money was "powder-type" and contained traces of cocaine); United States v. Kaufmann, 985 F.2d 884, 892-93 (7th Cir.1993) (holding that "[i]t is enough that the government prove that an enforcement officer or authorized person made the defendant aware of circumstances from which a reasonable person would infer that the property was [proceeds of a specified unlawful activity]"), cited with approval in Nelson, 66 F.3d at 1041. In brief, by hastily answering a question it should reserve for a later day, the majority risks announcing a rule with potentially far-reaching and unforeseen consequences.
 
 
 61
 Anderson's money laundering conviction requires reversal because the undercover officers failed to represent "a scheme or artifice" to obtain money from "a financial institution." 18 U.S.C. § 1344 (emphasis added). Since it is both sufficient and prudent to rest a reversal on this ground alone, I would not address a complicated issue unnecessary to this appeal's disposition. I thus concur only in the result reached by the majority.