391 F.3d 970
 UNITED STATES of America, Plaintiff-Appellee,
v.
Wayne ANDERSON, Defendant-Appellant.
 No. 02-10600.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted January 14, 2004.
 Filed June 10, 2004.
 Amended December 14, 2004.
 
 Michael L. Ware, Fort Worth, TX; Hill Snelling, Sacramento, CA; Michael L. Minns, Houston, TX, for the defendant-appellant.
 Benjamin B. Wagner, Assistant United States Attorney, Sacramento, CA, for the plaintiff-appellee.
 Appeal from the United States District Court for the Eastern District of California; Lawrence K. Karlton, Senior District Judge, Presiding. D.C. No. CR-01-00180-1-LKK.
 Before WALLACE, NOONAN, and McKEOWN, Circuit Judges.
 
 
 1
 Opinion by Judge Noonan; Concurrence by Judge Wallace
 
 ORDER
 
 2
 The opinion filed on June 10, 2004 is amended as follows:
 
 
 3
 Slip opinion, p.7677, strike the last ¶ , beginning "In its effort".
 
 
 4
 Slip opinion, p. 7678, Strike the first ¶ , beginning "As to the first element". Substitute for these 2 paragraphs the following: The first element was proved by Mitchell's statements to the banks that his customers were unable to make all the lease payments, which induced the banks to forgive the remaining portion of the outstanding loans, thereby depriving the banks of money owed to them. This representation described a species of fraud on the banks. United States v. Ely, 142 F.3d 1113 (9th Cir.1997). Mitchell represented that he knew his statement to be false; that it would reasonably influence the bank to forego further collection; and that it was intended to defraud the bank. Mitchell's representation, however, failed to satisfy the fifth element of 18 U.S.C. § 1344(2).
 
 
 5
 Slip opinion p.7678, ¶ 2, Strike: "Even assuming that the government claimed that the money was obtained from a bank". Capitalize "The".
 
 
 6
 With these changes made, the petitions for rehearing are DENIED. Judge Wallace would grant appellee's petition for rehearing.
 
 
 7
 Subsequent petitions for rehearing and for rehearing en banc may be filed.
 
 OPINION
 
 8
 NOONAN, Circuit Judge.
 
 
 9
 Wayne Anderson appeals the judgment of the district court convicting him of conspiracy and money laundering. Holding that the government failed to specify one of the offenses identified by 18 U.S.C. § 1956 as an offense permissibly represented in a sting operation, we reverse Anderson's conviction of money laundering. We affirm his conviction of conspiracy.
 
 FACTS
 
 10
 Suspicious that an organization named Anderson Ark & Associates (AAA) was engaged in facilitating income tax evasion and bankruptcy fraud, agents of the Internal Revenue Service (IRS) began an investigation followed by a series of stings that led to the arrest and conviction of several participants in this international organization. We summarize here evidence relevant to two stings implicating Anderson:
 
 
 11
 1. The Conspiracy To Commit Bankruptcy Fraud. In October of 2000, IRS Agent James Dowling posing as "Jim Mitchell" informed Richard Marks that he had $60,000 in cashier's checks that he wanted to hide from a bankruptcy court. Marks, an employee of AAA, put Dowling in touch with Karolyn Grosnickle, AAA's chief administrative officer. On behalf of AAA she accepted the checks and told Dowling that the funds would be sent by Anderson to an account set up by Mitchell with AAA in Costa Rica. Grosnickle identified Anderson as the head of AAA's domestic operations and the brother of its founder. Records on Anderson's computer and records obtained from Pinal County Federal Credit Union (PCFCU) show $60,000 from Anderson was deposited there in the name of Freddie Wood (the former companion of the founder), then transferred to Mitchell's AAA account in Costa Rica, $30,000 of which was then transferred to a secret account in the name of Mitchell in the United States. Grosnickle and Marks each identified Anderson as a key person in the money laundering scheme.
 
 
 12
 On January 31, 2001, in Los Osos, California, Agent Dowling in his role as Mitchell again met with Marks. Mitchell told Marks he had $100,000 in a safe deposit box in San Francisco that he needed to move. The next day Marks arranged for Mitchell to meet Anderson at a restaurant. Mitchell was accompanied by Diane Taggart, an IRS agent posing as Mitchell's girlfriend. Mitchell thanked Anderson for his help in hiding funds from the bankruptcy court, and Anderson acknowledged his thanks as follows:
 
 
 13
 Mitchell: So, and without that, I would
 have been out in the street.
 You know?

 Anderson: Belly up; huh?

 Mitchell: Been belly up.

 (Laughter.)

 Mitchell: Cause, I'll tell you, when that
 Bankruptcy Court comes
 through there, —

 ...

 Anderson: Eat it all up, and then they
 tell you here, you here, you
 can have what's all left.

 Mitchell: Right.

 Anderson: Yep, no problem, I've helped
 a couple of other people out
 with that.

 ...
 
 
 14
 2. The Bank Fraud. At the meeting in Los Osos, Mitchell launched into a new story as revealed in this transcript of a recording of the conversation:
 
 
 15
 Mitchell: ... What we do is we lease
 anything and everything for
 other companies or individuals.
 So, if it doesn't, basically,
 eat or excrete, we'll lease it
 for you. So, we've, I've got a
 good relationship with a, with
 a couple of banks, ah you
 know, in Boston, in New
 York, and Detroit, and they
 handle all the financing for
 me. So let's say, if you wanted
 to buy another, another
 motor home, okay, and you
 were a business, ah and you
 didn't want to buy it, but you
 wanted to lease it. You'd
 come to me, and I would arrange
 the leasing, and I'd go
 to the banks and get the financing.
 So, that's what
 we're doing now, and it's just,
 it's going great guns, and our
 profit, basically, comes in
 from, ah we charge a little bit
 more, just like any other finance
 company, for handling
 that for you and doing the
 paperwork and stuff. So,
 what we do is I, have a, a
 friend that, that developed
 over the years who is a ah
 banker, and he told me, he
 said, "Jim, look, you know,
 there is a better way of doing
 this. The banks are charging
 so much interest to you that,
 you know, they got a policy
 here that they only expect
 even, sometimes just 95 percent.
 If they get 95 percent
 payback, they're happier than
 a pig in slop." I said, "Well,
 what do you mean?" This
 guy the banker's name is
 Dick, and I said ah, "Well,
 what do you mean?" He said,
 "Well, look, he says, you're
 getting paid. Your leasees
 are paying you, and you, you
 pay over to the bank on the
 leases; right?" I said,
 "Yeah." He said, "So, if you
 only paid 95 percent of, of
 their loan in, the bank's happy;
 so, willing to do business
 with you, again." He says,
 "And you keep the five percent."
 Well, I said, "Okay."
 "Well let's see how this
 worked." So, we started doing
 that, and ah then we send
 the ban — a letter into the
 bank, and said, you know,
 "This is the on — we got 95
 percent sent back," and they
 said, "You're fine." I pay my,
 
 
 16
 my friend Dick a one percent
 commission, he's happy. I
 take the four percent. I cash
 the last check at the bank
 that the person wrote it on,
 come out with the cash. Everyone's
 happy, and the bank
 is beating down my door to do
 more business....

 ...

 Mitchell: Yeah. Well, my problem is, is
 like, the product I wind up
 with is a lot of cash.

 Anderson: Um-hum.

 Mitchell: Right? So, it's like, if you
 were the last, last, making
 the last payment or interim
 payment, I take it and cash it
 at your bank; right?

 Anderson: Don't they realize —

 Mitchell: And I walk out with it —

 Anderson: — you're pulling out four percent
 to yourself?

 Mitchell: No, I'm actually pulling five.
 I'm giving one percent to the
 banker.

 Mitchell: Um-um [negative], because I,
 I don't put it in my account.

 Anderson: Yeah?

 Mitchell: I cash it at the bank, the bank
 it's drawn on.

 Anderson: Yeah.

 Mitchell: So, that's why I've got this
 cash.

 Anderson: Yeah, but the bank you're
 doing that at has got to
 know what you're doing.

 Mitchell: They never ask questions.

 Anderson: They never ask questions.

 Anderson: Okay, but I mean they don't
 see you taking in the check
 to cash (unintelligible)

 ...

 Mitchell: ... At the end of the lease
 period, I write a letter to the
 bank in New York and Michigan,
 and I say, "You know, we
 got 95 percent paid, but, you
 know, things are bad with this
 company right now, and they
 can't pay." They send me a
 letter back saying, "Well, if
 you can't pay, that's close
 enough. That's good." Because
 they're making a ton of
 money.
 
 
 17
 Anderson told Mitchell he could help him and have the cash credited to Mitchell's AAA account in Costa Rica. Outside the restaurant Mitchell gave Anderson the cash in ten bundles of $10,000 in a bag. On February 15, 2003, Mitchell found $100,000 credited as Anderson had promised. Later in the month the amount was sent back to his secret account in the United States.
 
 PROCEEDINGS
 
 18
 On May 3, 2001, Anderson was indicted together with Marks, Grosnickle, and Anderson's brother. On April 29, 2002, Grosnickle pleaded guilty to one count of conspiracy to commit money laundering. On May 31, 2002, the jury found Marks and Anderson guilty on one count of conspiracy to launder money and found Anderson guilty on one count of money laundering. Anderson was sentenced on each count to 4 years and 11 months, to be served concurrently.
 
 
 19
 Anderson appeals.
 
 ANALYSIS
 
 20
 The Alleged Brady Violation. In the course of showing the movement of the $60,000 through an account in the name of Freddie Wood at PCFCU, the government called Freddie Wood, who testified that it was not she who had deposited the money. During the trial the government produced an employee of the bank who, when asked by the defense, testified that she believed that she was dealing with Freddie Wood when the deposit was made by telephone. Another bank employee, also belatedly identified by the government, confirmed this belief.
 
 
 21
 Anderson argues that the government's not identifying these two witnesses earlier was a violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), prejudicial to Anderson's cross-examination of Wood. The defense, however, did secure the testimony of these witnesses at trial and could have recalled Wood if it was believed that they would impeach her. The delay in identifying the two witnesses did not prejudice the defendant. United States v. Span, 970 F.2d 573, 583(9th Cir.1992).
 
 
 22
 The Conspiracy To Launder Money. Grosnickle and Marks each identified Anderson as the one who would help hide Mitchell's $60,000. Their identification shows a conspiracy and place Anderson within it. When Mitchell met Anderson for the first time on February 1, 2001 at the restaurant, Mitchell referred to what AAA had done. Anderson showed sufficient awareness that he had cooperated in Mitchell's fraud. Bankruptcy fraud in violation of 18 U.S.C. § 152 is one of the specified unlawful activities that may be represented to a suspected money launderer by an undercover government agent; agreement to launder money to conceal it from the bankruptcy court violates 18 U.S.C. § 1956.
 
 
 23
 Bank Fraud. We agree with Anderson that the government produced insufficient evidence to convict him on the money laundering/bank fraud count. This issue involves an interplay between 18 U.S.C. § 1956(a)(3)("sting" provision of money laundering statute) and 18 U.S.C. § 1344(2)(bank fraud statute) — an interplay made knottier by the subterfuge inherent in sting operations. To convict Anderson under 18 U.S.C. § 1956(a)(3), the government had to prove that Anderson conducted or attempted to conduct "a financial transaction" involving property represented to be the proceeds of "specified unlawful activity." In this case, the "specified unlawful activity" was bank fraud in violation of 18 U.S.C. § 1344(2). Two issues are presented: 1) whether the government produced sufficient evidence for a reasonable jury to conclude that Anderson conducted or attempted to conduct "a financial transaction"; and 2) whether the government sufficiently represented to Anderson that the $100,000 it gave him indeed constituted the proceeds of bank fraud. The government met its evidentiary burden on the former point, but fell short of meeting its burden on the latter. We are not unsympathetic to the government's argument that providing its targets with too much detail would spoil the sting, but the statute requires that the scenario of the sting represent specific unlawful acts.
 
 
 24
 Financial transaction. The government did produce sufficient evidence for a reasonable jury to conclude that Anderson conducted or attempted to conduct "a financial transaction." Section 1956(c)(4)(B) defines "financial transaction" to include "a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree." 18 U.S.C. § 1956(c)(4)(B). As it is used in 18 U.S.C. § 1956, then, the term "financial transaction" is a term of art constituting both an element of the offense and a jurisdictional prerequisite. See, e.g., United States v. Ripinsky, 109 F.3d 1436, 1443-44 (9th Cir. 1997), as amended by 129 F.3d 518 (9th Cir.1997). Here, the government produced evidence that the hand-off of the $100,000 in California led to a wire transfer of credit from Costa Rica to the United States, sufficient evidence for a reasonable jury to conclude that Anderson conducted or attempted to conduct "a financial transaction." Accordingly, in addition to satisfying its evidentiary burden on this element, the government also established a sufficient interstate commerce nexus to satisfy the jurisdictional prerequisite.
 
 
 25
 Anderson argues that the government was cabined by Count 5 of the indictment to proving that the currency "had been transported in interstate commerce" (as opposed to proving that the transaction affected interstate commerce after the "hand-off") in order to establish the jurisdictional nexus embodied in the "financial transaction" element of 18 U.S.C. § 1956. Count Five of the indictment charged that Anderson:
 
 
 26
 did knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, specifically, he received $100,000 in U.S. currency which had been transported in interstate commerce, which involved property represented by a person acting at the direction of, and with the approval of a law enforcement officer, to be the proceeds of specified unlawful activity, that is bank fraud in violation of Title 18 United States Code, Section 1344 .... All in violation of Title 18 United States Code, Sections 1956(a)(3) and (2).
 
 
 27
 To the extent the indictment went beyond alleging elements of the crime, "it is mere surplusage that need not be proved." United States v. Jenkins, 785 F.2d 1387, 1392 (9th Cir.1986). The government needed only to prove a financial transaction affecting interstate commerce; whether the interstate commerce occurred before or after Anderson received the funds is irrelevant. The language in the indictment specifying the timing of the interstate transport of currency is "surplusage." Anderson makes no claim that the indictment failed to inform him fully of the charges against him or prejudiced his defense. Reversal is not warranted on the ground that the currency itself was not proved to have been transported in interstate commerce.
 
 
 28
 Representation that $100,000 constituted the proceeds of bank fraud. The jury instruction given in this case aptly summarizes the elements of 18 U.S.C. § 1344(2) bank fraud:
 
 
 29
 First, there must exist a scheme or plan to obtain money or property from a financial institution by making a false statement or promise;
 
 
 30
 Second, the statement and/or promise was known by the maker of the statement or promise to be false;
 
 
 31
 Third, the statement or promise made to the financial institution was material, that is it would reasonably influence a bank to part with money or property;
 
 
 32
 Fourth, that the maker of the statement or promise acted with intent to defraud; and
 
 
 33
 Fifth, the financial institution was federally chartered or insured.
 
 
 34
 The first element was proved by Mitchell's statements to the banks that his customers were unable to make all the lease payments, which induced the banks to forgive the remaining portion of the outstanding loans, thereby depriving the banks of money owed to them. This representation described a species of fraud on the banks. United States v. Ely, 142 F.3d 1113 (9th Cir.1997). Mitchell represented that he knew his statement to be false; that it would reasonably influence the bank to forego further collection; and that it was intended to defraud the bank. Mitchell's representation, however, failed to satisfy the fifth element of 18 U.S.C. § 1344(2).
 
 
 35
 The undercover government agent did not represent to Anderson that the $100,000 he gave him was obtained from a federal-chartered or insured financial institution. In making the "representations" on which its case hinges, the government gave Anderson no details whatsoever about the banks purportedly used in the scheme. No representation is no representation.
 
 
 36
 The government argues that Anderson would have assumed that Mitchell's scheme involved a federal bank and that it is unrealistic to expect undercover agents to reveal whether a bank is federally insured during a staged illicit transaction. However, because the money laundering conviction in this case hinges entirely on the government's representations to Anderson, it is incumbent on the government to ensure that its representations sufficiently track the federal crime in order to put the participants on notice of the crime. Simply put, with time, resources, and opportunity to design the scenario, it is not too much to ask the government to get it right.
 
 
 37
 In his Reply Brief, Anderson sensibly does not repeat his argument that at trial he was misjoined with Marks, who had a higher level of culpability. It was not a winning argument.
 
 
 38
 For the reasons stated, Anderson's conviction and sentence on Count I are AFFIRMED; his conviction and sentence on Count V are REVERSED.
 
 WALLACE, Senior Circuit Judge, concurring:
 
 39
 I concur in the majority's opinion, except for its analysis of whether the funds Mitchell sought to launder were sufficiently "represented to be the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(3). My view is that Mitchell adequately represented that the funds were proceeds of bank fraud in violation of 18 U.S.C. § 1344, because the government was not required to represent that the financial institutions purportedly involved were federally insured. I would therefore affirm Anderson's money laundering conviction.
 
 
 40
 "To require government agents to ... specific[ally]" name defrauded banks or inform suspected money launderers that the victimized banks are federally insured "[c]ould make it difficult for undercover agents to enforce [section 1956], as real criminals would be unlikely to state explicitly[which banks were] the source of their funds." United States v. Nelson, 66 F.3d 1036, 1041 (9th Cir.1995). The majority's holding "[c]ould be too costly in the verisimilitude vital to sting operations," United States v. Wydermyer, 51 F.3d 319, 327 (2d Cir.1995), cited with approval in Nelson, 66 F.3d at 1041, and may serve no useful purpose in cases where "any person of ordinary intelligence" would recognize that the money constituted proceeds of an unlawful bank fraud. United States v. McLamb, 985 F.2d 1284, 1291(4th Cir.1993), cited with approval in Nelson, 66 F.3d at 1041; see also United States v. Leslie, 103 F.3d 1093, 1103-04 (2d Cir.1997) (affirming a money laundering conviction when a defendant "believed that the money was the proceeds" of a drug transaction based on an undercover FBI agent's statement that the money was "powder-type" and contained traces of cocaine); United States v. Kaufmann, 985 F.2d 884, 892-93 (7th Cir.1993) (holding that "[i]t is enough that the government prove that an enforcement officer or authorized person made the defendant aware of circumstances from which a reasonable person would infer that the property was drug proceeds"), cited with approval in Nelson, 66 F.3d at 1041. In brief, the majority announces a rule that is inconsistent with cases we approved in Nelson and that could have potentially far-reaching and unforeseen consequences.
 
 
 41
 In addition, at least one circuit has held that"[t]he [federally insured] status of the victim-institution is not a separate knowledge element of bank fraud under § 1344 but an objective fact that must be established in order for the statute to apply." United States v. Brandon, 17 F.3d 409, 425(1st Cir.1994). Thus, an actual scheme similar to the one described by Mitchell would violate section 1344 so long as the victimized banks were in fact federally insured, whether or not its architect knew of that fact. I am persuaded that this is a reasonable interpretation of section 1344. Furthermore, I fail to see why section 1956(a)(3) requires an agent seeking to launder proceeds from a staged section 1344 bank fraud to tell the money launderer about facts of which an actual perpetrator of bank fraud need not be aware. Rather, I would hold that property is adequately "represented to be the proceeds of specified unlawful activity," 18 U.S.C. § 1956(a)(3), if the government agent describes all the facts that an individual must know in order to be convicted of the offense constituting that specified unlawful activity.
 
 
 42
 Finally, even assuming the government was required to represent that the funds were obtained from a federally insured bank, the majority does not explain what type of representations would be sufficient. Must the agent specifically state that the defrauded banks were federally insured? Or is the majority persuaded by Anderson's contention that an agent need only "use the name of a well-known federally insured bank" because the government's burden is merely to "make some representation that would permit a reasonable person to infer that these banks were federally insured"? But if that accurately describes the relevant standard, it was met in this case. Although the majority states that "the government gave Anderson no details whatsoever about the banks purportedly used in the scheme," 371 F.3d at 612, Mitchell represented that he used banks "in Boston, in New York, and Detroit." Furthermore, he stated that his scheme involved a leasing business in Atlanta. If representing a bank's name supports a rational inference that the banks were federally insured, surely the national character of the scheme here is likewise sufficient.
 
 
 43
 For these reasons, I concur in the majority's opinion, except for its reversal of Anderson's money laundering conviction. I would affirm that conviction also.