Filed 3/21/24  P. v. Lee CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C098085 |
| Plaintiff and Respondent, | (Super. Ct. No. STKCRFECOD20180012122) |
| v. | |
| RICHARD ELMO LEE, | |
| Defendant and Appellant. | |

Defendant Richard Elmo Lee orchestrated the murder-for-hire of a doctor who treated his late wife.  A jury found defendant guilty of first degree murder and found true the special circumstance that the murder was committed for financial gain.  (Pen. Code, §§ 187, subd. (a) and 190.2, subd. (a)(1).)[1]  The trial court sentenced defendant to state prison for life without the possibility of parole.

---

[1] Undesignated statutory references are to the Penal Code.

1

Defendant appeals, raising two sets of issues. First, he argues the prosecution violated *Brady v. Maryland* (1963) 373 U.S. 83 (*Brady*) by failing to timely disclose information contained in the lead investigator's personnel records. In a related vein, he argues the trial court erred in denying mid-trial motions to dismiss and declare a mistrial, and a post-trial motion for a new trial.

Second, defendant argues the trial court erred in admitting evidence of a .32 caliber semiautomatic pistol that was not the murder weapon, or alternatively, that defense counsel rendered ineffective assistance in failing to object to evidence of the pistol.

We will reject both sets of issues and affirm the judgment.

## I. BACKGROUND

Defendant was married to Bonnie. They had been together since they were teenagers, some 60 years before the events described herein. Bonnie suffered from various health problems, including problems with one of her feet. Bonnie was treated for an ingrown toenail by Dr. Thomas Shock, a podiatrist. The toenail became infected and gangrenous, and Dr. Shock eventually amputated Bonnie's toes and half of her foot. Bonnie's health and quality of life declined precipitously, and she passed away in 2016 at the age of 78.

Defendant blamed Dr. Shock for Bonnie's death. He told his daughter, Cheri, he wanted Shock dead. At first, defendant told Cheri he intended to kill Shock and take his own life. Later, he told Cheri he met a man at a gas station who was going to help him kill Shock. Cheri thought defendant was just blowing off steam.

A.     *The Shooting of Dr. Shock*

Dr. Shock lived in Lodi with his wife of many years, Nancy. On the night of August 1, 2018, Nancy went upstairs to bed sometime between 9:00 and 9:30 p.m. Shock stayed downstairs.

2

A neighbor was walking across the street from the Shocks' house that night around 9:45 p.m.  The neighbor heard a gunshot and saw a man running toward a car parked in front of the Shocks' house.  Another neighbor was driving by the house around the same time.  That neighbor heard two gunshots and saw a light-colored SUV idling in front of the house.  Both neighbors saw someone drive away quickly.

Police officers from the Lodi Police Department responded shortly thereafter.  They found Dr. Shock lying across the threshold of the house.  Shock had been shot in the chest, arm, and head and was unresponsive.  An autopsy and ballistics analysis would later reveal that he had been shot three times at close range with bullets consistent with a .38 special or a .357 magnum revolver.  Shock was declared dead at the scene.

## B.     Investigation

Officers secured the scene and detectives began their investigation.  Surveillance videos from neighbors showed a single vehicle—an SUV—driving down the street around the time of the shooting.  The SUV was registered to codefendant Raymond Jacquett.

A piece of paper was found near the body.  Detective Michael Hitchcock, the lead investigator, determined the paper was a page from a complaint against Dr. Shock to the Medical Board of California by Bonnie.  The page was analyzed for fingerprints and found to contain the prints of codefendants Mallory Stewart and Christopher Costello.

A search warrant was executed on Costello's cell phone.[2]  An examination of the phone revealed that Costello called defendant the day before the shooting.

A search warrant was executed on defendant's house.  Police found a copy of Bonnie's complaint against Dr. Shock.  The complaint was missing a single page—the one found at the crime scene.   Police also found a handwritten note from defendant to his

---

[2] The name on the home screen of the phone, which was found in Costello's pocket, was "Yung Cos."  "Yung Cos" was believed to be Costello's nickname.

3

children, stating, in part: "Maybe I will find out why God took mom so soon and let her suffer so. I believe in an eye-for-an-eye . . . . I hope Shock spends his time in [hell] . . . and I get to see him face-to-face."

Police searched defendant's computer. They found several searches relating to Dr. Shock, including a search for his home address. They also found searches relating to guns and silencers. Defendant's bank records showed he made a series of withdrawals totaling $5,600 in the days before the shooting. They also reflected a charge at a diner in Sacramento on the day of the shooting.

A search of the California Department of Justice's automated firearm system database revealed that defendant owned three revolvers, all .38 caliber. No such weapon was found in defendant's house. However, police found a .32-caliber semiautomatic pistol. Police also found three boxes of .38 special ammunition, with 10 rounds missing from one of the boxes.

Police recovered several cell phones from defendant's house and car. As we shall discuss, call detail records showed defendant communicated with Costello and Stewart in the days leading up to the shooting. Cell site locational data likewise showed that members of the group were in the same places at the same times on the day of the shooting. Defendant and the others were arrested and taken into custody.

C. *Charges and Dispositions of Codefendants' Cases*

The four men—defendant, Costello, Stewart, and Jacquett—were charged by consolidated information with murder with special circumstances of murder for financial gain and lying in wait (§§ 187, subd. (a), 190.2, subd. (a)(1) and (15).)[3] Defendant pled not guilty and denied the allegations.

---

[3] The trial court granted defendant's motion to strike the special circumstance for lying in wait.

4

Jacquett and Costello were each tried separately. (See *People v. Jacquett* (July 14, 2022, C091059) [nonpub. opn.]; *People v. Costello* (May 9, 2023, C095289) [nonpub. opn.].) Jacquett was convicted of second degree murder and sentenced to 15 years to life in state prison. (*People v. Jacquett, supra,* C091059.)[4] Costello was convicted of first degree murder for financial gain and sentenced to life in prison without the possibility of parole. (*People v. Costello, supra,* C095289.)

Stewart entered a negotiated plea in which he agreed to plead guilty to first degree murder and receive a sentence of 50 years to life in state prison in exchange for his testimony against defendant.

D.     *Jury Trial*

Defendant's case was tried to a jury over the course of several weeks in March 2022. The prosecution's witnesses, including Detective Hitchcock, testified substantially as described *ante*.[5] The prosecution also presented other evidence that will be relevant here, which we will attempt to summarize as briefly as possible.

1.     *The Prosecution's Case*

As previously discussed, Cheri testified to conversations in which defendant, her father, expressed an intent to kill Dr. Shock. She also testified to conversations after the shooting. According to Cheri, defendant said three men came to his house on the night of August 1, 2018. Some of them, including defendant, drove to Shock's house. Defendant told Cheri he waited in the car and watched as one of the men walked to the door and

---

[4] Another panel of this court affirmed the conviction but remanded for resentencing because the trial court mistakenly believed Jacquett was statutorily ineligible for probation. (*People v. Jacquett, supra,* C091059.)

[5] It is not necessary to describe Hitchcock's testimony in detail; however, we will have more to say about Hitchcock (who also testified for the defense) later in this opinion.

5

shot Shock with defendant's .38 caliber revolver. Defendant said he paid the men $5,000. He asked Cheri to testify that he had given her $3,000.

Cheri was interviewed several times by Detective Hitchcock and Eduardo Rodriguez, an investigator with the San Joaquin County District Attorney's Office. She initially went along with defendant's version of events. She told Hitchcock and Rodriguez she received $3,000 or $3,500 from defendant and insisted he never said anything about hurting Dr. Shock. However, she later called Rodriguez and told him defendant had admitted to playing a role in the shooting.

Cross-examination focused on possible reasons for Cheri's change in tune. Cheri admitted lying to Detective Hitchcock when she said defendant had given her $3,000. She also admitted lying when she said he never mentioned hurting Dr. Shock. Cheri acknowledged that she had an interest in defendant's financial affairs and his mounting legal fees were a source of concern to her. At some point, Cheri learned one of defendant's attorneys had placed a lien on defendant's house. Cheri was disappointed, as she had always understood she and her brother stood to acquire an interest in the house. She urged her father to fire his attorney and retain someone less expensive. Defendant refused. Cheri called Detective Rodriguez less than two weeks later. Rodriguez, who testified for both the prosecution and defense, would later testify that Cheri was upset about the house when she told him about defendant's alleged admission.

Stewart testified pursuant to the aforementioned plea agreement. Stewart said he met defendant through Costello on the day of the shooting. They had lunch at a diner in Sacramento. Afterwards, they went to a nearby bank, where defendant withdrew money to give Costello. A plan was made to meet later at defendant's house in Lodi.

Stewart and Costello were eventually joined by Jacquett. The three men drove to defendant's house. Stewart and Costello went inside and spoke with defendant. Defendant showed them a photograph of Dr. Shock on the Internet. He told them he wanted Shock dead for having botched surgery on his wife. He showed them two guns

6

and suggested they use a pizza box as an excuse to approach Shock's door. In the end, they decided to approach Shock's door with a clipboard and piece of paper.

Defendant, Stewart, and Jacquett drove to Dr. Shock's house.[6] They parked in front. Stewart got out of the car and went to the door holding the clipboard and one of defendant's guns. Shock answered the door in his underwear. Stewart shot him and returned to the car. The group drove back to defendant's house. Defendant gave Stewart $3,000 and the gun. At some point, Stewart realized he no longer had the piece of paper from the clipboard.

Sara Morin, a crime analyst with the California Department of Justice, testified as an expert in the field of cell site analysis. Morin explained that she analyzed call detail records and cell phone extractions for phones associated with defendant, Stewart, Costello, and Jacquett.[7] The records showed cell phones associated with defendant and Costello connected with a cell tower near a store in Lodi on July 27, 2018. That connection was followed by a flurry of calls between the relevant phones over the next several days including two calls between phones associated with defendant, Costello, and Stewart, lasting more than 40 minutes altogether. On July 31, 2018, the day before the shooting, Stewart's phone sent defendant's phone a text message, stating: "Hey, im waitn for yall so I can get that job done for you."[8]

Cell site analysis of the relevant phones placed defendant and the other men in the same locations at the same times on the day of the murder. Phones associated with defendant and Costello were both near Stewart's house in Sacramento around 1:00 p.m.

---

[6] Costello appears to have left the group.

[7] Morin testified that she received the call detail records and cell phone extractions from Detective Hitchcock. However, Hitchcock would have received the call detail records from cell phone carriers. This will become important later.

[8] Defendant denied speaking to Stewart or receiving texts from him.

on August 1, 2018. There was no call activity between the phones from 1:00 p.m. to 2:00 p.m., but all three phones connected to cell towers near Stewart's house and the bank. At 2:23 p.m., defendant's phone connected with a cell tower near the diner in Sacramento.

Around 5:00 p.m., defendant's phone connected to a cell tower near his home in Lodi. Jacquett and Costello's phones connected to cell towers in Lodi shortly thereafter.[9] Costello's phone attempted to connect with defendant's phone, Jacquett's phone, and Stewart's phone in the 15 minutes preceding the shooting, but the calls went to voicemail or failed to connect. There was a break in cell phone activity around the time of the shooting.

Cell phone activity resumed within 20 minutes of the shooting, with a succession of three short calls between defendant's phone and phones associated with Costello. Cell phone activity between phones associated with defendant and Costello continued the next day. According to Morin, defendant's phone called Costello's phone at 11:07 a.m., and connected for less than two minutes. Costello's phone called defendant's phone at 3:51 p.m. that afternoon and connected for nearly five minutes. That call appears to have been the last contact between defendant's phone and of those of any of his codefendants.

All in all, Morin testified there were "less than 20 contacts" between defendant's phone and phones associated with Costello, and "about [10] contacts" between defendant's phone and phones associated with Stewart.[10] Significantly, all such contacts took place during the four-day period between July 30 and August 2, 2018. Morin also noted that the day of the shooting (August 1, 2018) was the only time defendant's phone

---

[9] Stewart testified he left his phone at home in Sacramento.

[10] By our count, there were 16 contacts between defendant's phone and phones associated with Costello, and nine contacts between defendant's phone and phones associated with Stewart.

connected with a cell tower in Sacramento or Jacquett's phone connected with a cell tower in Lodi.

On cross-examination, Morin explained that she received the names of suspected users of the relevant phones from Detective Hitchcock. Morin acknowledged she has no way of knowing the names of the suspected users are correct. She also acknowledged she has no way of knowing what might have been said during conversations between users.

2. *Defense Case*

Defendant testified in his own defense and denied any involvement in Dr. Shock's murder. Defendant acknowledged meeting Costello at the store in Lodi on July 31, 2018. However, he testified that Costello offered to sell him pain pills. Defendant said he bought the pills and exchanged phone numbers with Costello. He then drove Costello to Stockton. As they drove, defendant told Costello about what had happened to Bonnie.

According to defendant, Costello called the next day to offer more pills for sale. Defendant drove Costello to Sacramento, where they were joined by Stewart. The group went to a diner, where they had lunch and discussed pills defendant might buy. They went to the bank and agreed to meet at defendant's house in Lodi to complete another transaction for pills. Somewhere along the line, on July 30 or July 31, 2018, defendant withdrew $5,000 from the bank. He said he gave $3,500 to Cheri and kept the balance for himself.

Defendant confirmed that Costello and Stewart came to his house on August 1, 2018, as agreed. They were driven by Jacquett, who waited in the car while the others discussed the drug deal. According to defendant, Costello and Stewart noticed photographs of Bonnie and asked about her. Around the same time, Costello told defendant they intended to rob him. Costello took pills, money, and two guns from defendant's bedroom. He also took a single page from Bonnie's complaint against Dr. Shock. According to defendant, Costello handed the page to Stewart and told him to "go

9

do what I told you." Costello and Jacquett left defendant's house, leaving Stewart behind. Eventually, Jacquett came back and collected Stewart.

The next day, Costello called and demanded $4,000. When defendant asked what for, Costello responded, "we did you a favor." That, defendant said, was the last he heard from any of his codefendants.

Defendant testified he gave Cheri power of attorney following his arrest. But father and daughter argued about legal expenses. According to defendant, Cheri became upset upon learning that he had given a prior attorney an attorney's lien. What's more, defendant said, his son told him that Cheri and her boyfriend were spending all his money. Defendant eventually revoked Cheri's power of attorney and granted that authority to his son. Defendant denied telling Cheri he planned to kill Dr. Shock.

On cross-examination, defendant acknowledged speaking with Detective Hitchcock for several hours on September 20, 2018, but saying nothing about pills or a robbery. He admitted driving by Dr. Shock's house and searching the Internet for information about Shock and guns. He allowed that he might have told Hitchcock he had no revolvers or, if he were going to buy a gun, it would be an automatic. He also said he regularly researches guns and other things on the Internet to pass the time.

### E.     Verdict and Sentence

The jury found defendant guilty of first degree murder after approximately two hours of deliberation. (§ 187, subd. (a).) The jury found true the special circumstance allegation that the murder was committed for financial gain. (§ 190.2, subd. (a)(1).) The trial court sentenced defendant to life in state prison without the possibility of parole. This appeal timely followed.

## II.  DISCUSSION

### A.     Brady Violation

Defendant argues for reversal based on an alleged *Brady* violation. He argues the prosecution's failure to timely disclose information contained in Detective Hitchcock's

10

personnel records deprived him of due process and a fair trial. He also argues the trial court erred in denying his motions to dismiss, declare a mistrial, and order a new trial. None of these arguments carry the day.

> 1.    *Additional Background*

Detective Hitchcock was arrested for misdemeanor driving under the influence in October 2021. The prosecutor notified defense counsel of the arrest by letter dated January 6, 2022. Defense counsel decided against seeking more information by filing a motion pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

Trial began on March 2, 2022. Several days later, on March 8, 2022, defense counsel learned through courthouse gossip that Detective Hitchcock may have been involved in an internal affairs investigation concerning "the way he disposes of evidence." By then, Hitchcock had already completed his testimony for the prosecution.

Defendant filed a *Pitchess* motion seeking discovery of information from Detective Hitchcock's personnel records. The trial court heard the motion on an expedited basis on March 14, 2022. After hearing objections from the City Attorney and Lodi Police Department, the trial court conducted an in camera review and found the records contained discoverable information. By now, the prosecution had rested, and defendant was scheduled to present his defense the next day. The trial court continued the case for one week to give the defense an opportunity to review the *Pitchess* material and conduct any necessary investigation.

Trial resumed on March 22, 2022. Outside the presence of the jury, defense counsel informed the trial court that he had interviewed witnesses from the Lodi Police Department and learned that allegations had been sustained that Detective Hitchcock mishandled evidence, including various cell phones. Defense counsel reminded the trial court that Hitchcock had handled cell phones belonging to defendant and others and provided information to Morin for use in her cell site analysis.

11

Defense counsel argued he would have prepared the case differently had he known Detective Hitchcock had been reprimanded for "mishandling electronic devices." Specifically, he said he would have "hired expert witnesses to get those cell phones that were analyzed in this case and to have them do their own extractions and to compare the records that were provided by the service providers."

Defense counsel acknowledged he could impeach Detective Hitchcock "and have the jury understand that he has mishandled evidence in the past." But he said he had still been put "at a great disadvantage" because he could not demonstrate that Hitchcock had mishandled evidence here. Had the information been timely disclosed, defense counsel said, he "would have made greater efforts to find out if [Hitchcock] did mishandle evidence in this case." With trial set to resume that very day, the implication was that it was now too late to do so. Accordingly, defense counsel moved to dismiss the case or, in the alternative, declare a mistrial. The trial court denied both motions.

The defense recalled Detective Hitchcock. Hitchcock testified he recovered cell phones from defendant's house and car and booked them into evidence. He also recovered and booked cell phones from Stewart and Costello. Hitchcock said he did not extract data from any of the phones; that task fell to another officer. However, Hitchcock downloaded the extracted data onto an electronic storage device (a disk or USB drive) and drove the device to the California Department of Justice in Sacramento, where he physically delivered it to Morin.

Detective Hitchcock acknowledged having been the subject of an internal affairs investigation in 2021. The investigation involved two firearms booked into evidence in another case. Hitchcock explained that he checked the firearms out of the evidence room with the intention of taking them to the ballistics testing center for testing. However, he failed to send the firearms to the ballistics testing center for two weeks. As a result, he was found to have violated police department policies and local rules.

Detective Hitchcock also acknowledged having received letters of reprimand on two occasions. On one occasion, Hitchcock had been downloading data from cell phones using Cellebrite equipment. That process can be time consuming, Hitchcock said, so he worked on more than one phone at a time, leaving them to download in a locked drawer or cabinet of his desk. Hitchcock somehow mixed the phones up and transposed numbers on the evidence envelopes, resulting in the release of the wrong phone to the wrong person. He testified he was reprimanded for mishandling evidence.

On another occasion, Hitchcock recalled recovering several electronic devices from a residence and trying to book them all into evidence as a group, rather than individually. Hitchcock testified he was reprimanded for booking the evidence improperly. Hitchcock also testified that he had recently resigned from the Lodi Police Department to accept a job in the private sector.

On cross-examination, Detective Hitchcock maintained no evidence had been compromised in any of the cases in which he had been investigated or reprimanded. He added that he followed protocols in the present case, and Morin would have double checked the data extracted from the phones against the phone records from the cell phone carriers to ensure they matched.

After the verdict, defendant moved for a new trial on the ground that the delayed disclosure of information concerning Detective Hitchcock's mishandling of cell phones in other cases violated his rights to due process and a fair trial. The trial court denied the motion, finding, again, that the information was required to be disclosed by *Brady*, but the court's remedial measures, including the week-long continuance and expedited hearing on defendant's *Pitchess* motion, were sufficient to remedy any potential violation.

2.     *Applicable Legal Principles and Standards of Review*

"The federal due process clause prohibits the prosecution from suppressing evidence materially favorable to the accused. The duty of disclosure exists regardless of

13

good or bad faith, and regardless of whether the defense has requested the materials." (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1132 (*Zambrano*), overruled on another ground as stated in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; see *Brady, supra,* 373 U.S. at p. 87.) "There are three elements to a *Brady* violation:  (1) the state withholds evidence, either willfully or inadvertently, (2) the evidence at issue is favorable to the defendant, either because it is exculpatory or impeaching, and (3) the evidence is material." (*People v. Lewis* (2015) 240 Cal.App.4th 257, 263 (*Lewis*).)  Reversal for failure to turn over exculpatory evidence is required only if the evidence is material. (*Zambrano, supra,* at p. 1133.)

Evidence is material under *Brady* if there is "a reasonable probability its disclosure would have altered the trial result." (*Zambrano, supra,* 41 Cal.4th at p. 1132.)  " 'The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.' " (*In re Brown* (1998) 17 Cal.4th 873, 886.)  In other words, "the defendant must show that 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' " (*Lewis, supra,* 240 Cal.App.4th at p. 263.) "Materiality includes consideration of the effect of the nondisclosure on defense investigations and trial strategies." (*Zambrano, supra,* at p. 1132.)

We independently determine whether a *Brady* violation has occurred, giving great weight to the trial court's factual findings that are supported by substantial evidence. (*People v. Letner & Tobin* (2010) 50 Cal.4th 99, 176.)  We review the trial court's ruling on defendant's motion for a new trial based on the alleged *Brady* violation for abuse of discretion.  (*People v. Hoyos* (2007) 41 Cal.4th 872, 917, fn. 27.)  In that circumstance, "the asserted abuse of discretion is the asserted failure of the trial court to recognize violations of defendant's constitutional rights." (*Ibid.*)  We apply the same deferential standard of review to rulings on defendant's motions to dismiss the charges and declare a

mistrial. (*People v. Velasco-Palacios* (2015) 235 Cal.App.4th 439, 445 [motion to dismiss]; *People v. Avila* (2006) 38 Cal.4th 491, 573 [mistrial].)

  *3.*    *Analysis*

  Defendant argues the prosecution violated *Brady* by failing to timely disclose information from Detective Hitchcock's personnel records. The People appear to concede the second *Brady* element: that the information was favorable to defendant. We accept the apparent concession and focus on the first and third elements, which we consider in turn.

  *a.*    *Whether the Information Was Withheld*

  Reading his briefs generously, defendant suggests the untimely disclosure of information from Detective Hitchcock's personnel records was tantamount to a failure to disclose. The People respond that the information, "while disclosed late, [was] nonetheless disclosed to the defense before trial ended," and so cannot be said to have been withheld. The People are not wrong, but that does not end the matter.

  Our Supreme Court considered the midtrial disclosure of *Brady* material—fingerprint testing reports—in *People v. Mora and Rangel* (2018) 5 Cal.5th 442, 467-468 (*Mora and Rangel*).) There, as here, the reports were only disclosed after the prosecution rested at trial. (*Id.* at p. 465.) Upon receiving the reports, the defendants moved for a mistrial, arguing the untimely disclosure impaired their ability to effectively cross-examine police officers who testified during the prosecution's case-in-chief. (*Id.* at p. 466.) The trial court denied the motion. (*Ibid.*)

  The Supreme Court found no *Brady* violation. (*Mora and Rangel, supra,* 5 Cal.5th at p. 467.) The high court explained: "Evidence actually presented at trial is not considered suppressed for *Brady* purposes, even if that evidence had not been previously disclosed during discovery." (*Ibid.*) But that was not all. The Supreme Court also said, "when considering whether delayed disclosure rather than 'total nondisclosure' constitutes a *Brady* violation, 'the applicable test is whether defense counsel was

15

"prevented by the delay from using the disclosed material effectively in preparing and presenting the defendant's case." ' " (*Ibid.*; see also *United States v. Anderson* (9th Cir. 2004) 391 F.3d 970, 975 [no *Brady* violation from government's delay in identifying two witnesses where defense secured the witnesses and had opportunity to recall other witnesses who could have been impeached]; *United States v. Tyndall* (8th Cir. 2008) 521 F.3d 877, 882 ["A mid-trial disclosure violates *Brady* only if it comes too late for the defense to make use of it"].)  Put another way, evidence that is belatedly disclosed during trial may be considered suppressed or withheld within the meaning of *Brady* if the delay causes prejudice.  (*United States v. Burke* (10th Cir. 2009) 571 F.3d 1048, 1055-1056 [observing that a majority of federal Courts of Appeal have held that while untimely disclosure of *Brady* material does not constitute a constitutional violation in itself, it may violate due process if the defendant can show he was prejudiced by the delay].)  We thus turn to the question of prejudice, which is encompassed by the third *Brady* element.

>           b.          *Whether the Information Was Material*

"Prejudice" in the context of a potential *Brady* violation turns "on 'the materiality of the evidence to the issue of guilt and innocence.' " (*People v. Salazar* (2005) 35 Cal.4th 1031, 1043.)  To demonstrate the materiality necessary to establish a *Brady* violation in a delayed disclosure case, a defendant must show what he would have done differently had he been given more time to address the *Brady* evidence, and how earlier disclosure would have given rise to a reasonable probability that the outcome of the trial would have been different.  (*McNeill v. Bagley* (6th Cir. 2021) 10 F.4th 588, 600-601; *United States v. Blackwell* (6th Cir. 2006) 459 F.3d 739, 759.)  This defendant fails to do.

Defendant suggests defense counsel would have prepared the case differently had he known Detective Hitchcock had been disciplined for "mishandling evidence." Specifically, he suggests he would have retained an expert to poke holes in the prosecution's cell phone evidence.  There are several problems with this argument.

First, as the People observe, Detective Hitchcock played only a limited role in handling the cell phone evidence. Hitchcock testified on recall that he recovered phones from defendant's house and car and booked them into evidence. Another officer extracted data from the phones and Hitchcock downloaded the data onto an electronic storage device, which he delivered to Morin. Although Hitchcock may have struggled with similar tasks in the past, there was no evidence he had any such issues here. To the contrary, Hitchcock's uncontradicted testimony was that he followed the protocols and procedures set by the Lodi Police Department.

Second, and related, there was no evidence that Detective Hitchcock was meaningfully involved in processing or preparing the evidence on which Morin relied. As previously discussed, Morin testified she relied on call detail records and cell phone extractions. Again, the evidence showed that another officer performed the extractions. Although Hitchcock downloaded the data onto an electronic storage device and delivered the device to Morin, nothing suggests he was involved in manipulating data, such that he could have interfered with Morin's analysis. Similarly, the evidence showed that Hitchcock obtained call detail records from cell service carriers, which he passed along to Morin, together with his theories about which users may have been associated with which phones. Here again, there was no evidence Hitchcock was involved in manipulating the data on which Morin relied. At most, he appears to have functioned as a courier so far as Morin was concerned.

Defendant invites us to presume that Detective Hitchcock, having been reprimanded for mishandling cell phone evidence in the past, must surely have mishandled such evidence again.[11] But defendant has not established that Hitchcock

_____

[11] Defendant adds another level of speculation in his reply brief, in which he asserts that Detective Hitchcock either "resigned under threat of termination" from the Lodi Police

17

handled cell phone evidence at all, at the data level, other than in the most rudimentary sense. In the absence of any explanation as to how Hitchcock might have mishandled evidence, we are left to speculate that he must have messed up somehow. But the mere possibility that some unidentified expert might have so testified does not establish materiality. (See *United States v. Agurs* (1976) 427 U.S. 97, 109-110; *People v. Fauber* (1992) 2 Cal.4th 792, 829.)

Third, even assuming an expert had been obtained, and testified to Detective Hitchcock's mishandling of cell phone evidence in some way, such testimony would not have been reasonably likely to change the outcome of the trial. As previously discussed, the prosecution relied on two types of cell phone evidence: (1) evidence of communications between phones; and (2) evidence that the relevant phones connected with cell towers near the same places around the same times. Significantly, defendant's own testimony confirms the essential accuracy of both types of evidence.

Morin testified to a series of communications between defendant's phone and phones associated with Costello and Stewart in the days leading up to the shooting. Morin also testified to communications between defendant's phone and phones associated with Costello on the day of the shooting and the day after. Defendant denied communicating with Stewart by phone but admitted speaking with Costello. Although he claims to have discussed potential drug deals, rather than murder-for-hire, the evidence was undisputed that defendant was in frequent phone communication with at least one of his coconspirators on the days leading up to the shooting and the day after. An expert would not have changed much, given the defense's decision to offer another reason for the communications, rather than deny them altogether.

Department or experienced "outright termination." Neither assertion is supported by any citation to record evidence.

18

Morin also testified that: phones associated with defendant and Costello connected with cell towers near the store in Lodi on July 27, 2018; phones associated with defendant, Costello, and Stewart connected with cell towers near Stewart's house in Sacramento on the afternoon of August 1, 2018; and phones associated with defendant, Costello, and Jacquet connected with cell towers in Lodi on the evening of August 1, 2018. Here, too, defendant's testimony generally confirmed Morin's. He admitted meeting Costello at the store on July 27, 2018, admitted meeting Costello and Stewart for lunch at the diner in Sacramento on the day of the murder, and admitted inviting them to his home in Lodi later that same day. Although he offered another reason for the meetings, he made no attempt to deny they took place.

Under the circumstances, we discern no reasonable probability the outcome of the trial would have been different had the information from Detective Hitchcock's personnel records been disclosed sooner. Even assuming that Hitchcock had mishandled cell phone evidence in some way, and an expert had been retained to so testify, the jury would have still had to decide between the prosecution's murder-for-hire theory and the defense theory that Costello ordered Stewart to murder Dr. Shock as some sort of favor to defendant. The jury would still have to weigh Cheri and Stewart's credibility against defendant's and decide whether the purpose of the phone calls and meetings was to arrange a murder or buy pills. Defendant has given us no reason to believe defense counsel would have prepared for trial differently, or the jury would have made another choice, had the information from Hitchcock's personnel records been disclosed sooner. We therefore reject defendant's *Brady* claim. Having done so, we likewise reject defendant's arguments that the trial court abused its discretion in denying his motions to dismiss, for a mistrial, and for a new trial.

B.      *Alleged Error in Admitting Evidence of .32 Caliber Semiautomatic Pistol*

Defendant next argues the trial court erred in admitting evidence of a .32 caliber semiautomatic pistol found in his house. Specifically, he argues the evidence should

have been excluded as irrelevant because the pistol was not believed to be the murder weapon. He also argues the evidence was improper character evidence, and more prejudicial than probative. The People respond that defendant forfeited this claim by failing to object in the trial court. We agree with the People. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1318-1319.)

Anticipating forfeiture, defendant argues in the alternative that defense counsel was ineffective in failing to object to the .32 caliber semiautomatic pistol. We are not persuaded.

To prevail on a claim of ineffective assistance of counsel a claim, defendant must establish "not only deficient performance, i.e., representation below an objective standard of reasonableness, but also resultant prejudice. [Citation.] Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts." (*People v. Bolin* (1998) 18 Cal.4th 297, 333.) "In the usual case, where counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions." (*People v. Weaver* (2001) 26 Cal.4th 876, 926.)

Here, defense counsel could have reasonably declined to object for tactical reasons. Defendant told Detective Hitchcock he had no revolvers, which was untrue. He also said he regularly researched guns on the Internet, and if he were going to buy a gun, it would be an automatic. Defense counsel could have reasonably believed the .32 caliber semiautomatic pistol explained both defendant's false statement to Hitchcock (e.g., he was confused about which guns he had), and his suspicious search history (e.g., he was simply interested in guns). The ineffective assistance of counsel claim fails.

## III.  DISPOSITION

The judgment is affirmed.


/S/

_____

RENNER, J.


We concur:


/S/

_____

HULL, Acting P. J.


/S/

_____

MAURO, J.